[Crim. No. 11473. Second Dist., Div. Four. Aug. 5, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES C. NEWTON, Defendant and Appellant.

Ethelyn F. Black, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Harvey D. Unrot, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged, in three counts, with (count I) burglary in violation of section 459 of the Penal Code, (count II) rape in violation of subdivision (3) of section 261 of the Penal Code, and (count III) robbery in violation of section 211 of the Penal Code. He pled not guilty; after a jury trial, he was found guilty on all three counts, the jury fixing the degree of burglary as first degree. The trial court found that a deadly weapon was used in the commission of each of the offenses, that defendant was personally armed with a deadly weapon in the perpetration of each offense and that defendant had used the deadly weapon on the person of the victim in each instance.

A motion for new trial was denied; probation was denied. Defendant was sentenced to state prison on each count, the sentences of counts II and III being stayed in order to comply with the requirements of section 654 of the Penal Code.[1] His propria persona notice of appeal purports to appeal from the verdict, from the order denying the motion for new trial as well as from the judgment. The first two matters are not appealable and those portions of the appeal must be dismissed.

All three offenses were allegedly part of a single transaction wherein it is claimed defendant entered. the room where the alleged victim, Miss ''A,'' was sleeping, raped her by means

---

[1]Consult *People* v. *Niles* (1964) 227 Cal.App.2d 749, 754-756 [39 **Cal. Rptr.** 11].

of force and violence and in leaving stole $20 and her watch. According to the alleged victim, she was awakened by a noise at the window; she went to the window and, several times, asked "Who is there?" Defendant then removed the screen, entered the room, and warned her to keep still because he had a gun. Defendant then threatened her with a knife and forced her to lie down on a bed roll on the floor and committed two acts of intercourse. Thereafter he asked her where she kept her money and she indicated her purse. Later she discovered that $20 and a gold watch were missing. Miss "A" testified that, because of a porch light, she was able to distinguish defendant's features and recognize him as her assailant.

Defendant testified that he had never seen Miss "A" prior to his arraignment, that he had never entered her apartment, and generally denied any connection with the events recounted by Miss "A." There was no evidence that the allegedly stolen watch was found in defendant's possession.

## I

Defense counsel argues vigorously that the evidence was not sufficient to support the verdicts. She points to sundry inconsistencies in the story, including the fact that a drape that Miss "A" could not see through still let in enough light to identify an assailant at 3 a.m., the fact that defendant was able to commit forcible rape in a room crowded with furniture and knick-knacks, and the fact that, although the police did not transport Miss "A" to the station for medical examination until after 4:15 a.m., the material introduced as being a specimen containing spermatozoa allegedly taken from Miss "A's" vaginal tract, was, according to official records, taken by the police doctor at 3 a.m.

The evidence comes close to being incredible. But the jury, after deliberating for almost three days, and after hearing some testimony reread, accepted the prosecution's version and the trial court endorsed the verdicts by denying a new trial. We cannot say that the evidence had so little credibility as to justify us in rejecting it entirely. Were it not for the errors hereinafter discussed, the verdicts, and the judgment based thereon, would have to stand.

## II

The alleged offenses occurred at about 3 a.m., on Sunday, January 25, 1965. At about 11:55 p.m., on Monday, February 1, 1965, police officers riding in a patrol car, in an area about a mile from Miss "A's" apartment, saw a man

acting in a suspicious manner near an unoccupied building. There had been reports of prowlers in that neighborhood. The officers turned their flashlight on him; he ran and was apprehended after a short flight and a struggle. He proved to be defendant.

Over objection, the trial court permitted evidence of these events, which resulted in defendant's arrest, to be introduced in evidence. The theory, proposed by the prosecutor and accepted by the trial court, was that this was evidence of flight and that evidence of flight was evidence of consciousness of guilt.[2]

The proposition is so preposterous that we would not believe that it had seriously been urged and accepted if the record were not before us in clear words. ■ In order for flight to have evidentiary force, it must take place under circumstances such that it appears that defendant knew that he was charged with the crime involved and that he was attempting to avoid apprehension for that offense. (Pen. Code, § 1127c; *People* v. *Goodwin* (1927) 202 Cal. 527, 539-541 [261 P. 1009] ; *People* v. *Jones* (1911) 160 Cal. 358 [117 P. 176] ; *People* v. *Draper* (1945) 69 Cal.App.2d 781, 786 [160 P.2d 80].)

■ Here there was no showing, and no attempt to show, that defendant had even a suspicion that he was suspected of the crimes herein involved. In fact, it is uncontradicted that

---

[2]We quote the portions of the reporter's transcript which cover this episode:

"Q Did you have any difficulty obtaining custody of the defendant at that time?

Mr. Drabin: Objection. It is immaterial as far as any issue is concerned in this case.

"The Court: Read the question, please.

" (Whereupon the record was read by the reporter as follows:)

" 'Q Did you have any difficulty obtaining custody of the defendant at that time?'

"The Court: It could be or could not be. There could be an indication of flight. There are jury instructions covering that point as a matter of law. I will take the answer. You may answer it and see where we are.

"The Witness: Yes, sir, we did.

"Q By Mr. Carlson: Was there some movement on the part of the defendant?

"A That's correct.

"Q What did he do?

"A We were there on a prowler call and as we approached the location of 1208 North Orange Grove——

"Mr. Drabin: If your Honor pleases, I will object to any testimony of this officer at this time on the ground it is outside the scope of the issues of this case whatsoever.

"The Court: I don't know. It may go to the question of flight. I don't know. It could be material. It couldn't be material. You may answer the question. I will accept it subject to a ruling by the Court. Answer the question. Get right to the point if you will."

he was not arrested for the present offenses and that the police did not question him concerning them at the time of his apprehension or later. Miss ''A'' admittedly did not know the alleged assailant and made no identification of defendant as the alleged assailant until a week after his apprehension when she was shown ''mug'' shots of him and saw him in a police lineup. His conduct on February 1, 1965, may conceivably suggest some guilty feelings with reference to some crime being committed or attempted at that time and place; it shed no light whatsoever on his guilt or innocence of the alleged offenses on January 25th. It was misconduct for the prosecution to have offered the evidence in question, and error on the part of the court to admit it.

No motion to strike was made. We have augmented the record on this appeal by an examination of the original instructions requested and given, as they appear in the superior court file. The promised instruction on flight was not given, and there is nothing to indicate that it was requested. The Attorney General argues that the point was thereby waived. We do not agree. The statutory instruction on flight, above cited,[3] would only have been misleading and the evidence once heard by the jury, tending as it did to suggest that defendant was a ''bad man'' was of such a nature that no stock instruction at the close of the case could have removed its adverse effect.

### III

It was the theory of the defense that the entire episode was an hallucination on the part of Miss ''A.'' In an attempt to support that theory it was brought out, on cross-examination, that she had been convicted of possession of marijuana, a felony. Defense counsel then sought to develop facts concerning her mental condition. We quote the record as to the fate of that effort:

''Q. By MR. DRABIN: Additionally have you ever been under the care of a psychiatrist?

---

[3]Section 1127c, Penal Code.

''In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

''The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.

''No further instruction on the subject of flight need be given.''

"A. No.

"Q. Do you know a Doctor Merril Friend?

"A. Yes, I did see him once.

"Q. And was that in connection with mental or emotional or hallucination problems?

"A. Well, the Court ordered me to see him at the time. This was a couple of years ago.

"Q. When was this conviction of a felony?

"A. Almost three years ago. Over three years ago, I guess.

"Q. Incidentally, are you registered as a narcotics user?

"MR. CARLSON: I will object.

"THE COURT: It is immaterial to this case.

"MR. DRABIN: If your Honor pleases, it goes to her credibility and competency to testify in this matter.

"THE COURT: I don't think so. The objection will be sustained.

"Q. By MR. DRABIN: How many times did you see Doctor Friend?

"A. Perhaps twice. Once or twice.

"Q. Did you see him any times other than that?

"A. No.

"Q. Tell your probation officer that you were seeing him regularly?

"A. No. She knew I was seeing him.

"Q. I am asking you did you tell your probation officer?

"A. Yes, she knew when I was seeing him.

"Q. That is not the answer to my question.

"MR. CARLSON: I will object. It is an improper form of impeachment, your Honor. It appears if counsel wants to lay a foundation for impeachment based upon hallucinations that he ought to get to the medical questions if there are any.

"THE COURT: Let's see where we are. Are you seeking to impeach a statement of this witness?

"MR. DRABIN: Yes, your Honor.

"THE COURT: What statement?

"MR. DRABIN: The statement she only saw the doctor on one or two occasions.

"MR. CARLSON: Objection as immaterial.

"THE COURT: It would be immaterial I think to the point at issue. It would be immaterial what she told her doctor as far as this trial is concerned. It is immaterial. Sustained.

"Q. By MR. DRABIN: Did you ever tell the doctor when you saw him you were having emotional problems?

"MR. CARLSON: Objection, immaterial, your Honor.

"THE COURT: As to what happened three years ago? Sustained.

Q. BY MR. DRABIN: When is the last time you saw the doctor?

"MR. CARLSON: I will object, your Honor, for the same reason.

"THE COURT: I think it is immaterial to this case. Sustained.

"MR. DRABIN: It goes to her competency and to the credibility of her testimony, if your Honor pleases.

"THE COURT: I don't think so. Sustained."

This, also, was error. Even assuming (which we are not here prepared to say) that consultation two years before on emotional problems was too remote, defendant was clearly entitled to pursue the cross-examination in order to substantiate, if possible, the contention, clearly expressed, that there had been consultations at a later date. Here the case rested on the uncorroborated testimony of Miss "A"; that testimony made out an extremely weak case for conviction;[4] the jury found it necessary to deliberate for almost three days—one day longer than the trial had consumed. Although it has been held that it is within the discretion of the trial judge to admit or exclude evidence of the psychiatric condition of the complaining witness (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 170 et seq. [49 Cal.Rptr. 302, 410 P.2d 838]) still, in light of the discussion in that case, and the holdings in *People* v. *Scholl* (1964) 225 Cal.App.2d 558, 562 [37 Cal.Rptr. 475], and in *People* v. *Hurlburt* (1958) 166 Cal.App.2d 334 [333 P.2d 282, 75 A.L.R.2d 500], that discretion should be exercised liberally in favor of the defense. Certainly counsel should not be shut off, *in limine,* in an attempt to lay a foundation against which the discretion could intelligently be exercised.

## IV

 As we have said, the prosecution's case was weak. If defendant is innocent, he tendered the only evidence possible for him to offer, as the prosecuting attorney admitted.

---

[4] We have set forth some of the inconsistencies in the evidence. It would unduly burden this opinion to set forth all of them. It is an understatement to say that Miss "A's" testimony was confused and internally contradictory. While, as we have said, we cannot say that the jury could not distill from it enough facts to sustain the verdicts, the jury clearly was entitled to have the case go to it free from the deliberate introduction of extraneous attacks on defendant's character and with as much data on the alleged victim's credibility as could be given to it.

The erroneous admission of the evidence of defendant's conduct when he was arrested, eight days later, for a disconnected offense, and the peremptory cutting off of a legitimate line of cross-examination, cannot be said to have been nonprejudicial, and those errors compel a reversal.

The judgment is reversed; the purported appeals from the verdict and from the order denying a motion for new trial are dismissed.

Files, P. J., and Jefferson, J., concurred.