[Crim. No. 11965.   In Bank.   Aug. 14, 1968.]

## THE PEOPLE, Plaintiff and Respondent, v. THOMAS JOHN RUSSEL, Defendant and Appellant.

Thomas John Russel, in pro. per., and Frank G. Prantil, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gerald H. Genard, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant was charged by indictment with one count of committing lewd and lascivious acts upon the body of a child under the age of 14 years (Pen. Code, § 288; count I) and two counts of incest (Pen. Code, § 285; counts 2 and 3); he was also charged with three prior felony convictions. He pleaded not guilty and admitted the prior felony convictions. On May 24, 1966, a jury was unable to reach a verdict, and the court declared a mistrial and discharged the jury. On August 23, 1966, after retrial, a jury found defendant guilty of two counts of incest as charged in counts 2 and 3 of the indictment.[1] After it had been determined by appropriate proceedings that defendant was not a mentally disordered sex offender (Welf. & Inst. Code, § 6300 et seq.), defendant was sentenced to the state prison for the term prescribed by law.[2] Defendant appeals from the judgment.[3]

· The principal issue confronting us is whether or not the trial court committed reversible error in refusing to admit psychiatric evidence relating to the mental and emotional condition of the complaining witness. We have concluded that it did.

Roxanne Russel, the complaining witness and the natural

---

[1]Count 1 of the indictment, charging defendant with violation of section 288 of the Penal Code, was dismissed upon motion of the prosecutor prior to retrial.

[2]It was ordered that the sentence on count 2 run consecutively with the sentence for which defendant was then on parole and that the sentence on count 3 run concurrently with the sentence imposed on count 2.

· [3]Defendant was ably represented at the retrial and before the Court of Appeal by Frank G. Prantil, Esq., of San Diego. After we had granted a hearing in response to a petition prepared by Mr. Prantil, defendant requested that no attorney be appointed to represent him in this court. We granted that request and permitted defendant to proceed in propria persona, first pointing out to him that he would not be permitted to argue the case orally. Accordingly, the matter was submitted to us on the briefs and without oral argument.

daughter of defendant,[4] was 13 years of age at the time of the act of incest charged in count 2 (April 1965) and was 14 years of age at the time of the act of incest charged in count 3 (February 14, 1966). She testified on direct examination at the second trial that on an undesignated date in April 1965 defendant, who had recently returned to the family home after an absence of two and one-half years, called her into his bedroom and there performed an act of sexual intercourse with her; that during the ten months following this date defendant performed such acts with her about once a week; that such acts always occurred in the absence of defendant's wife (Roxanne's stepmother); that in all defendant had sexual intercourse with her on some fifty separate occasions; that the last of such acts occurred on February 14, 1966; and that on the day following this act she ran away from home, and on the next day, after her stepmother had located her at the house of a friend, she told her stepmother and the police of defendant's conduct.

On cross-examination, the defense established Roxanne had testified at the *first* trial that her father had engaged in sexual intercourse with her "approximately four times" but no more than ten times. On redirect examination she testified that she had lied in the earlier trial because she was "embarrassed in admitting how many times it actually occurred. . . ." Roxanne also testified on cross-examination that immediately after the last act of sexual intercourse on February 14, 1966, she in her father's presence threatened to reveal his conduct; and that she had brought the charges in order to hurt her father. Roxanne further testified that she had never dated boys her own age and that she did not entertain any boys at her home at any time after April 1965.[5] There was medical testimony that Roxanne had "a well-developed marital vagina," which indicated that she had engaged in acts of sexual intercourse.

It was the theory of the defense, as developed through the

[4]In his supplemental brief in propria persona, filed in this court on April 17, 1968, defendant has set forth as an exhibit his declaration, apparently filed originally in support of a petition for habeas corpus, to the effect that Roxanne Russel is not his natural daughter. This matter was not raised below, and in fact defendant's trial testimony both admits paternity and contradicts many facts alleged in the newly filed declaration. For these reasons, we do not here consider the issue of paternity.

[5]Both defendant and his wife testified to their knowledge Roxanne had never dated or entertained boys. Defendant testified, however, that Roxanne was home alone during the day in the summer months, and that he and his wife had mentioned to one another the possibility that she was entertaining boys at the house.

testimony of defendant and his wife, that Roxanne's accusations were false and were a reaction on her part to defendant's strict regulation of her social and personal conduct and his stern disciplinary practices.

On August 12, 1966, five days before the commencement of the retrial, a hearing was had before the Honorable Robert W. Conyers, who had presided at the first trial, upon defendant's motion for an order requiring Roxanne to undergo a psychiatric examination for the purpose of determining whether her mental or emotional condition affected her veracity. Judge Conyers granted the motion subject to five conditions: (1) that the juvenile court, of which Roxanne was apparently a ward at the time, approve the order; (2) that the trial date not be delayed because of the examination; (3) that the district attorney be advised as to the time of the examination; (4) that the district attorney might be present "during any history taking"; and (5) that a report of the examination be made available to the district attorney. On August 16, 1966, the examination was conducted at juvenile hall by Dr. David R. Rubin.

On August 17, 1966, the retrial began before the Honorable John A. Hewicker, and on the following day, prior to the commencement of testimony, defendant made an offer of proof based upon the findings of the examination. It appearing, however, that Dr. Rubin had not prepared a written report to be made available to the prosecutor in accordance with the conditions of the examination order, the court reserved its ruling on the offer of proof until such a report should be prepared. On the day next following, August 19, 1966, a Friday, Dr. Rubin appeared to testify in defendant's behalf, but he had not yet prepared his written report and it was then arranged that he should dictate his report to a secretary in the prosecutor's office so that the court could make its ruling on Monday.

The report was prepared accordingly and was apparently made available to the prosecutor over the weekend. On Monday, August 22, 1966, the report on Roxanne, together with a report which Dr. Rubin had prepared as to defendant's own mental condition, was presented to the court for its ruling on the offer of proof. The record, which is set forth in relevant part in the footnote,[6] does not clearly indicate whether the

6 "MR. PRANTIL [defense attorney]: . . . I would ask his Honor to read these reports to show the materiality of [Dr. Rubin's] testimony. (Hands document to Court.) THE COURT: Which one is this? MR.

court 'read the report on Roxanne at this time, but in· any event the court, after hearing argument on the part of the prosecutor, refused to admit any psychiatric evidence as to Roxanne's mental condition.

The report of Dr. Rubin concerning Roxanne is set forth in full in the footnote.[7]

---

PRANTIL: This is on his [defendant's] daughter, Roxanne. There is one on her and one on him. I think they are fair reports and are very material to this case. THE COURT [to the prosecutor]: Have you read these? MR. HANSCOM [the prosecutor]: I have read them. THE COURT: Do you think they are material? MR. HANSCOM: First of all, with respect to Roxanne, I don't think they are material and I strenuously object and I think under the People versus Ballard [*Ballard v. Superior Court* (1966) 64 Cal.2d 159, 171-177 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]], that it is quite clear it is up to the discretion of the Court. If we are going to have a psychiatrist come in and say the heck with the jury, we might as well have a panel of psychiatrists. The only possible issue would be his idea of whether she can tell the truth, and he doesn't say she can't tell the truth. MR. PRANTIL: Yes, he does. MR. HANSCOM: His report, I don't think goes anywhere to the issues and he talked to the girl for twenty minutes, and on the basis of that he made his report. We had her in here for an hour and the Court and jury heard her. If twenty minutes is enough, then I don't understand what counsel cross-examined her for an hour for. So I don't think it is material at all and I don't think the Court has to let it in. THE COURT: As to Roxanne I am not going to let it in. MR. PRANTIL: May I say something? The Ballard case has to do with examination prior to trial and the Ballard case cites other cases for authority in allowing a psychiatric examination of a chief complaining witness concerning her veracity, allowing that type of evidence is admissible. THE COURT: I have read the Ballard case and I think it is discretionary, and so forth. As far as this is concerned, I don't think it is admissible. . . . [Further discussion concerning Dr. Rubin's report concerning defendant's mental condition] MR. PRANTIL: As far as Dr. Rubin's testimony is concerned, did I understand, your Honor, that you are not allowing me to ask him any questions concerning the conversation between him and Roxanne Russel? THE COURT: That is right. MR. PRANTIL: And no statements she made to him? THE COURT: That is right. That invades the province of the jury.''

[7]''TO WHOM IT MAY CONCERN: This patient was examined at Juvenile Hall in the presence of Sharon Farmer on August 16, 1966. The results of this examination are included in the following report.

''SUBJECTIVE: According to information supplied by the patient she was forced to engage in sexual intercourse by her father once per week for approximately 10 months. She stated that on all occasions that activity was against her will but nevertheless she submitted. Recently, however, she complained to her mother who took action. The patient's reason for telling her mother was stated, ''So I could get my father in trouble.'' She also remarked, ''I told her so he would be sorry for doing it.'' The girl further remarked that, ''I thought he would change when he got out of prison but he was too happy.'' She explained that upon her release from Juvenile Hall she had been depressed and discouraged and expected her father to be the same when he was released from Chino prison. She also complained that on visiting her father at the prison she found him ''too happy.''

''The girl was then asked, ''Do you tell the truth all the time?'' She replied, ''No, I lie to keep from getting in trouble.'' In response to the question, ''Have you told the truth to everyone in Juvenile Hall?'' she

In *Ballard* v. *Superior Court, supra,* 64 Cal.2d 159, at pages 171-177 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], we held that, in cases involving sex violations, (1) the admission of psychiatric evidence as to the mental and emotional condition of a complaining witness for the purpose of impeaching her credibility is a matter to be determined by the trial court through the exercise of sound legal discretion, and (2) the trial court may, also in the exercise of sound legal discretion, order that a complaining witness submit to a psychiatric examination for this purpose ''if the circumstances indicate a necessity'' therefor (64 Cal.2d at p. 176; see Annot. 18 A.L.R.3d 1433 et seq.). In the instant case, however, we are not concerned with the propriety of psychiatric *examination* under the circumstances, for defendant's motion for such an examination was granted, subject to certain conditions, and the examination was in fact performed. Instead we here must decide whether an abuse of discretion occurred when the trial court, upon being presented with an offer of proof based upon the ordered examination and consisting in part of a written report of that examination, refused to admit psychiatric evidence contemplated by the offer of proof.

We have explicated the concept of judicial discretion on

---

replied, ''Not about one thing.'' She then elaborated, ''The probation officer and the District Attorney explained how important it was for me to testify about it tomorrow in court.''

''The patient also mentioned that she had recently run away from the facility at La Verne to return to Juvenile Hall because she 'liked it better there'

''OBJECTIVE: Mental evaluation of this patient fails to reveal any evidence of psychosis or paranoiac nucleus. No indication of hallucinations or delusional pattern was evident. Intellectual level seems to be average. An overlay of depression was obvious, as well as some degree of agitation. The overall impression was that of marked instability emotionally and defensiveness.

''DISCUSSION: This girl appears to have a serious emotional problem marked by an impulsive and unpredictable behavior as well as a tendency to lose contact with and distort reality. It is my opinion that she is at times unable to distinguish between what occurs in reality and the product of her own phantasies. This is confirmed in part by her admission that she deliberately lies when she feels it is convenient for her.

''If it were necessary to delineate a cause for her mental illness I would be tempted to relate it to her disordered, unstable and abnormal childhood. I feel that mistreatment by her father intensified her emotional problem.

''This young girl requires immediate and intensive psychotherapy if any rehabilitation is to be accomplished.

''IMPRESSION: Psychopathic personality with depressive component and predominance of phantasy.''

''David R. Rubin, M.D.''

innumerable occasions and in a variety of factual contexts. Obviously the term is a broad and elastic one (see 27 C.J.S. p. 292) which we have equated with "the sound judgment of the court, to be exercised according to the rules of law." (*Lent* v. *Tillson* (1887) 72 Cal. 404, 422 [14 P. 71].) We have also declared that the "only limitation that the law had placed upon the exercise of discretionary judicial power is, that it must not be abused" (*Clavey* v. *Lord* (1891) 87 Cal. 413, 419 [25 P. 493]) observing at the same time that "it may be difficult to define exactly what is meant by abuse of judicial discretion. . . . (*Idem.*) However we have said: " 'In a legal sense discretion is abused whenever in the exercise of its discretion the court exceeds the bounds of reason, all of the circumstances before it being considered.' " (*State Farm etc. Ins. Co.* v. *Superior Court* (1956) 47 Cal.2d 428, 432 [304 P.2d 13], quoting *Berry* v. *Chaplin* (1946) 74 Cal.App.2d 669, 672 [169 P.2d 453] ; see also *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889] and cases therein cited.)

The courts have never ascribed to judicial discretion a potential without restraint. In the early case of *Bailey* v. *Taaffe* (1866) 29 Cal. 422, at page 424, this court took pains to delineate limits of judicial discretion in the following terms: "The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia,* but a legal discretion, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice." Similar standards were expressed in *Gossman* v. *Gossman* (1942) 52 Cal.App.2d 184, 195 [126 P.2d 178], where the court quoted from *Davis* v. *Boston Elevated Ry. Co.* (1920) 235 Mass. 482, 496-497 [126 N.E. 841] as follows: " 'The word imports the exercise of discriminating judgment within the bounds of reason. Discretion in this connection means a sound judicial discretion, enlightened by intelligence and learning, controlled by sound principles of law, of firm courage combined with the calmness of a cool mind, free from partiality, not swayed by sympathy nor warped by prejudice nor moved by any kind of influence save alone the overwhelming passion to do that which is just.' "

The foregoing authorities, and particularly the pas-

sages quoted from *Bailey* and *Gossman*, make it quite clear, we think, that all exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue. We shall here undertake to briefly outline some of the considerations relevant to discretionary determinations concerning the production and admission of psychiatric evidence bearing on credibility.

In our *Ballard* opinion we set forth in a footnote (which is quoted in relevant part in the margin)[8] some of the "dangers" involved in the use of psychiatric evidence to impeach credibility. As we there suggested, each of the considerations indicated is a factor to be weighed by the court at some point in the course of its overall determinations relative to the production and admission of such evidence. It must be observed, however, that some of these factors pertain for the most part to determinations undertaken at the time of passing upon the motion for examination, while some are peculiarly relevant to determinations undertaken when the products of an ordered examination are sought to be introduced into evidence.

When the court passes upon a motion for psychiatric examination of the complaining witness, the question before it is whether, in light of the totality of circumstances revealed, it is necessary or proper that psychiatric knowledge in general be utilized in order to aid the trier of fact in its assessment of credibility. This decision must rest for the most part on the court's judgment as to whether an emotional or mental condition is involved which a body of laymen either would be unable to detect or would be unable to relate in terms of effect to the matter of credibility. (See generally McCormick, Evidence (1954) § 13, pp. 28-29; 7 Wigmore, Evidence (3d ed. 1940), § 1918, pp. 10-14; Juviler, *Psychiatric Opinions as to Credi-*

---

[8] "10. . . . A psychiatrist's testimony on the credibility of a witness may involve many dangers: the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify issues; the testimony may be distracting, time-consuming and costly. (See generally Juviler, *Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach, supra,* [1960] 48 Cal. L.Rev. 648; McCormick on Evidence, *supra,* [1954] 100; Comment, *Psychiatric Evaluation of the Mentally Abnormal Witness, supra,* [1950] 59 Yale L.J. 1324.)" (64 Cal.2d at p. 175, fn. 10.)

*bility of Witnesses*: *A Suggested Approach* (1960) 48 Cal. L.Rev. 648, 660-661.)[9]

When such an examination *has* been ordered by the court, however, and evidence based upon it is sought to be introduced, the court must address itself to considerations dealing with the specific evidence offered. ▮ Thus, it must be determined from the offer of proof and, if necessary, from *voir dire* examination, if the evidence sought to be introduced bears upon the matter at issue, to wit, the *credibility* of the complaining witness—by showing the effect of a particular mental or emotional condition upon her ability to tell the truth. In addition, the evidence offered must be examined with a view to ensuring that the knowledge which it represents can be effectively communicated to the jury; evidence studded with arcane terms is of no benefit to a lay fact-finding body. Further, the court should make a determination as to whether the examination which is the basis of the evidence utilized techniques of general scientific acceptance and was sufficiently thorough to facilitate a reliable opinion. Finally, the evidence should be examined with a view to preserving the integrity of the jury as the finder of facts: expert opinion is admitted in this area in order to inform the jury of the effect of a certain medical condition upon the ability of the witness to tell the truth—not in order to decide for the jury whether the witness was or was not telling the truth on a patricular occasion.[10] (See generally Juviler, *Psychiatric Opinions as to Credibility of Witnesses*: *A Suggested Approach, supra,* 48 Cal.L.Rev. 648.)

It is to be emphasized, however, that the considerations above suggested can be undertaken only in the course of a thorough review of the evidence sought to be introduced as it is set forth in the offer of proof. ▮ Further, we are of the view that the reasoning underlying the court's conclusion as to the admission of such evidence should appear to some degree in the record in order that appellate review of that

[9] Of course there are many other factors involved in the court's determination of whether to order an examination. Among them are considerations of time, expense, and the convenience of witnesses, as well as the court's own assessment of the accuracy of techniques and methods proposed to be utilized in the examination.

[10] We do not intend to indicate or imply that the factors above noted constitute the exclusive guides and standards by which the court's discretion is to be exercised. Judicial discretion too closely hedged about with standards for its exercise at some point ceases to be discretion. We attempt here only a brief elucidation of general outlines suggested by our *Ballard* opinion.

conclusion, which reaches only to abuses of the court's discretion (*Ballard* v. *Superior Court, supra,* 64 Cal.2d 159, 174-175), may be facilitated.

In the instant case our review of the trial court's refusal to admit psychiatric evidence bearing on Roxanne's credibility is hampered by a record which does little to reveal the basis of the discretionary determination underlying that ruling. We have concluded, however, that the record as a whole is sufficient to permit our resolution of the question whether an abuse of discretion occurred, and we have resolved that question in favor of the defendant.

We observe at the outset that Dr. Rubin's examination of Roxanne was ordered after a full trial on the merits had resulted in a disagreement of the jury and a declared mistrial —and that the order was made by Judge Conyers, who had presided at the first trial. As we have indicated above, that order, the propriety of which is not here questioned, represents a determination on the part of Judge Conyers that recourse to psychiatric opinion was necessary or proper in order to aid the trier of fact in assessing the credibility of the complaining witness. Although the order is not now under attack and does not require our reappraisal, it is worthy of comment that the first trial jury which failed to reach a verdict must have had some reservations concerning the credibility of the complaining witness and that Judge Conyers himself may have shared them.

We appreciate, nevertheless, that the ordering of the psychiatric examination was but the first step, and that, as we have pointed out, the psychiatric testimony based upon such examination was admissible to the extent determined by the judge presiding at the retrial in the exercise of a sound legal discretion. Of necessity, "its utility in the ascertainment of the prosecutirx' condition must depend upon its posture in the whole picture presented to the trial court." (*Ballard* v. *Superior Court, supra,* 64 Cal.2d 159, 174-175.)

As we have suggested, the scrutiny of the proffered evidence to be employed by the trial judge in making such determination is properly concerned with considerations such as the relevance of the evidence on the issue of credibility, the probability of effective communication of the substance of the expert opinion to the jury, the adequacy of the examination to provide the basis of a reliable opinion, and the tendency of the evidence to decide rather than inform.

█ Finally, having in mind the rationale and objective of *Ballard* and the danger in sex offense cases that the charge may rest on the credibility of the child as against the bare denial of the defendant, we think that the legal discretion of the judge should be exercised liberally in favor of the defendant. (See *People* v. *Newton* (1966) 244 Cal.App.2d 82, 88 [52 Cal.Rptr. 727].)

█ As we have indicated above, defendant offered to prove through the testimony of Dr. Rubin matters which were outlined in his report prepared in accordance with the prior order of Judge Conyers. Applying to that report (see fn. 7, *ante*) the guidelines which we have elucidated above, we observe first that it outlines an opinion bearing directly upon the credibility of the complaining witness. Secondly, although the report utilizes certain technical terms which might be unfamiliar to lay persons, we do not consider this a serious problem in the circumstances because the doctor could well have clarified any difficult language from the stand. It also appears that the examination upon which the report was based consumed only twenty minutes,[11] but, even if we assume that a reliable psychiatric opinion cannot be found in the course of a twenty-minute examination, we do not believe that this factor in itself was sufficient to justify exclusion, especially in view of the fact that the length of the examination could have been brought out during cross-examination. Finally, we think it clear that the report does not prefigure testimony which would tend to usurp the jury's function by deciding factual issues reserved to that body; rather it contemplates testimony which would properly seek to inform the jury of mental and emotional conditions which might have an effect upon the ability of the complaining witness to tell the truth on a given occasion.

We have set forth above (fn. 6, *ante*) the colloquy which took place at the time of the court's ruling and have observed that the court's failure to place in the record its reasons for the ruling has rendered our task on appeal a difficult one. As the transcript reveals, the court there gave no suggestion as to the basis of its ruling beyond its comment, when asked wheth-

---

[11] Immediately prior to the ruling the prosecutor stated to the court that the examination had lasted only twenty minutes. The record does not disclose the source of the prosecutor's information on this point. It appears, however, that pursuant to Judge Conyers' order a representative of the prosecutor was present at the examination, and it is to be assumed that that representative provided the information in question to him.

er testimony by the doctor relating to his examination of Roxanne would be admitted, that "That invades the province of the jury." Although the grammatical antecedent of the pronoun "That" is not made clear by the context of the remark, we have concluded that the indicated reason is inadequate to justify exclusion regardless of the grammatical interpretation placed upon it. If "That" denotes the use of psychiatric evidence *per se* on credibility issues in sex cases, our *Ballard* decision makes clear that such evidence is admissible within the sound legal discretion of the court. If "That" denotes psychiatric evidence of any kind in the case at bar, the propriety of resort to psychiatric knowledge in the case was already determined by the granting of the motion for examination. If "That" denotes the specific psychiatric evidence proposed by the offer of proof, we have already noted that that specific evidence was not of such a character as to usurp the jury's independent judgment on the issue of credibility.

It is thus apparent that the remarks of the court which might be construed as reasons underlying its ruling do not afford a sufficient basis for the ruling in question. It might reasonably be argued in addition, however, that the court impliedly adopted the reasons expressed by the prosecutor immediately prior to the ruling. Those reasons, fairly summarized (see fn. 6, *ante*) are: (1) evidence given by psychiatrists tends to overwhelm the independent judgment of the jury; (2) the report outlining contemplated testimony does not relate to credibility because it does not state that Roxanne is unable to tell the truth; and (3) the examination upon which contemplated evidence was to be based consumed only twenty minutes. We have said enough above as to the first and third of these reasons. As for the second reason, it seems to be suggested that psychiatric evidence can have a bearing upon credibility only if it states a *total inability* to tell the truth; if this were so, there would surely be very little psychiatric evidence received on issues of credibility.

It thus appears that neither the reason given by the trial court, nor the reasons advanced by the prosecutor prior to the ruling and impliedly adopted by the court, were sufficient to warrant exclusion of the psychiatric evidence outlined in the offer of proof.[12] In addition, we have been unable to conceive

---

[12]The written report itself, which formed the basis of the offer of proof, is of course hearsay and cannot be admitted to prove the truth of matters asserted therein unless it is shown to fall within an exception to the hearsay rule or is admitted by stipulation.

of any other proper basis for the ruling. We therefore conclude that the ruling was in excess of the court's legal discretion in the premises, and that the judgment must be reversed.

Defendant's remaining contentions, which we have examined for the purpose of providing any necessary guidance upon retrial, are either wholly without merit or deal with matters not likely to recur.

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Presiding Justice Brown in the opinion prepared by him for the Court of Appeal, Fourth Appellate District, Division One (*People* v. *Russel*, 4 Crim. 2841, filed December 13, 1967, certified for nonpublication).