[S.F. No. 22738. In Bank. June 19, 1970.]

CLINTON CURRY et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY
AND COUNTY OF SAN FRANCISCO, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Marvin Friedman, under appointment by the Supreme Court, Edward T. Mancuso, Public Defender, Charles G. Warner and James G. Magee, Deputy Public Defenders, for Petitioners.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Michael J. Phelan, Deputy Attorney General, for Respondent and Real Party in Interest.

## OPINION

**MOSK, J.**—By this proceeding in prohibition petitioners Clinton Curry and Lionel Pete McCoy seek to prevent their trial on a charge of murder, contending they have been once in jeopardy for this offense. We conclude that the plea is justified and the relief prayed for should be granted.

Petitioners were brought to trial on an indictment charging them with the murder of Jimmy Carney. A jury was duly sworn, and several witnesses for the prosecution were examined. On the afternoon of the second day of trial, the prosecution called Christine Patterson to the witness stand. On direct examination, Miss Patterson testified that at 8 p.m. on the day of the shooting she went out for a walk. Carney, whom she had known about a year, called to her to stop and fired a gun twice into the air to attract her attention. He put the gun in his pocket, and the two walked on together. In due course they stopped at a service station while Carney made a telephone call. A car drove up, and petitioners Curry and McCoy got out. Curry accused Carney of "cussing out his mother," and an altercation ensued. Miss Patterson testified that McCoy handed Curry a gun; that some blows were struck, and Carney started to run; that McCoy shouted, "Shoot him," and Curry fired once, the bullet striking Carney in the head.

Miss Patterson, a teenager, as were the other participants in this tragedy, underwent a vigorous cross-examination. She was the sole eyewitness to the shooting, and the defense made a major issue of her ability to identify the alleged murder weapon. She testified she could not describe the weapon, knew nothing about guns, and had never had a gun in her possession. Yet when defense counsel asked her if she had ever fired a gun, she answered in the affirmative. She testified she had talked with one Louis Lee about this case, and had fired a gun at him when he refused to leave her house. Counsel then asked her if she had ever been under psychiatric care, and she replied that she had. She also acknowledged that shortly after the shooting of Carney she attempted suicide by an overdose of sleeping pills. The prosecutor voiced no objection to any of the foregoing testimony.

On the third day of trial the prosecutor took Miss Patterson on redirect examination and inquired into her motive in firing a shot at Louis Lee. She testified that she did so because he threatened "to have some of Pete and Clinton's [i.e., petitioners'] friends shoot me." Defense counsel then requested that the jury be instructed that such statements made by a third party "cannot be attributed" to petitioners, and the court asked for argument on the point.

In chambers outside the presence of the jury, counsel reiterated, "Your

Honor, I think the alleged threats made by this Louis Lee in which the names of the defendants have been mentioned can be extremely prejudicial to the defendants unless the jury is cautioned." The court replied, however, that it was troubled by the admission of *any* of Miss Patterson's testimony concerning her shooting at Lee. Counsel stressed he did not object to the testimony as such and was "not quarreling" with it, but the court said, "this calls plainly for hearsay testimony, and as such it's objectionable. But on the other hand, it's in the record and it's prejudicial to the People if we leave it in its present status without some explanation." The court then added, "I am also troubled about the matter that came up last weekend and the supposed mental illness of this witness. That has no place in this record, either, but it came in without objection." The prosecutor pointed out that by the latter evidence "Counsel intended to impeach her, showing she's unstable," but the court replied, "You can't impeach a witness by showing that she was under care of a psychiatrist." Remarking that "I don't know whether I can save this trial or not at this point," the court then called a recess.

Upon reconvening, the court ruled as follows: "Gentlemen, after some reflection I have reached the conclusion that under the present state of this record it's impossible to have a fair trial either from the point of view of the People or the defendants, so I am with some reluctance, of course, declaring this to be a mistrial and transferring the matter to Department 23 for trial. . . ." In response to an inquiry by the prosecutor, the court specified that the grounds for its ruling were "The present state of the record with respect to the alleged firing of a hand gun at some third person, a man by the name of Lee," and "the question . . . that's been asked as to the alleged mental illness of the People's witness." The court discharged the jury on these same grounds, and petitioners thereafter entered pleas of once in jeopardy. (Pen. Code, § 1016, subd. 5.)

■ Prohibition is a proper remedy to prevent retrial when a defendant has been once in jeopardy. (*Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 5 [22 Cal.Rptr. 649, 372 P.2d 641], and cases cited.)

■ Article I, section 13, of the California Constitution declares that "No person shall be twice put in jeopardy for the same offense. . . ." Implementing this constitutional command, the decisions of this court have settled the now familiar rules that (1) jeopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn, and (2) a discharge of that jury without a verdict is equivalent in law to an acquittal and bars a retrial, unless the defendant consented thereto or legal necessity required it. (*Paulson* v. *Superior Court* (1962) *supra*, 58 Cal.2d 1, 5; *Cardenas* v.

*Superior Court* (1961) 56 Cal.2d 273, 275 [14 Cal.Rptr. 657, 363 P.2d 889, 100 A.L.R.2d 371]; *Jackson* v. *Superior Court* (1937) 10 Cal.2d 350, 352-357 [74 P.2d 243, 113 A.L.R. 1422], and cases cited; see also Pen. Code, §§ 654, 687, 1023, 1140, and 1141.)

■ In the case at bar the record demonstrates that at the time the court declared a mistrial and discharged the jury, jeopardy had attached pursuant to the foregoing rules; the sole remaining issues, therefore, are consent and legal necessity.

At no time did petitioners, in person or through counsel, expressly consent to the granting of the mistrial or the discharge of the jury. The People maintain that petitioners impliedly gave such consent, but the contention does not withstand analysis. ■ When a trial court proposes to discharge a jury without legal necessity therefor, the defendant is under no duty to object in order to claim the protection of the constitutional guarantee, and his mere silence in the face of an ensuing discharge cannot be deemed a waiver. (*Mitchell* v. *Superior Court* (1962) 207 Cal.App.2d 643, 647 [24 Cal.Rptr. 671]; *Hutson* v. *Superior Court* (1962) 203 Cal.App.2d 687, 691-692 [21 Cal.Rptr. 753]; cf. *People* v. *Valenti* (1957) 49 Cal.2d 199, 202, 208-209 [316 P.2d 633].) ■ It is true that affirmative conduct by the defendant may constitute a waiver if it clearly evidences consent (*People* v. *Kelly* (1933) 132 Cal.App. 118, 122-123 [22 P.2d 526]; cf. *People* v. *Terry* (1970) 2 Cal.3d 362, 386 [85 Cal.Rptr. 409, 466 P.2d 961]; see generally Note, 63 A.L.R.2d 782), and such a waiver will a fortiori be implied when the defendant actually initiates or joins in a motion for mistrial (*People* v. *Mills* (1957) 148 Cal.App.2d 392, 394-395 [306 P.2d 1005]).

■ No such motion, however, was made in the case at bar. When the record is fairly read, it is clear that defense counsel requested no more than a cautionary instruction advising the jury that the alleged threats of Louis Lee, reported in the testimony of Miss Patterson, were hearsay as to these petitioners. Counsel neither objected to this testimony as such, nor moved to strike it; indeed, he expressly represented to the court that he had no quarrel with it. In these circumstances, petitioners' simple request for an admonition on an evidentiary matter cannot be magnified into a waiver of their constitutional protection against double jeopardy.

■ Secondly, there was no "legal necessity"—as that concept has been limited in our decisions—for the court to declare a mistrial and discharge the jury without petitioners' consent. ■ In California, legal necessity for a mistrial typically arises from an inability of the jury to agree (Pen. Code, § 1140; *Paulson* v. *Superior Court* (1962) *supra*, 58

Cal.2d 1, 5) or from physical causes beyond the control of the court (Pen. Code, § 1141; *Cardenas* v. *Superior Court* (1961) *supra,* 56 Cal.2d 273, 276), such as the death, illness, or absence of judge or juror (Pen. Code, §§ 1123, 1147; *People* v. *Ross* (1890) 85 Cal. 383 [24 P. 789]; *People* v. *Hess* (1951) 107 Cal.App.2d 407, 425-426 [237 P.2d 568]) or of the defendant (Pen. Code, § 1043; *People* v. *Higgins* (1881) 59 Cal. 357, 358). A mere error of law or procedure, however, does not constitute legal necessity. (*Cardenas* v. *Superior Court* (1961) *supra,* 56 Cal.2d 273 [prosecutor's question on cross-examination objected to by defendant]; *People* v. *Huff* (1967) 255 Cal.App.2d 443 [63 Cal.Rptr. 317] [testimony of police officer that he saw defendant talking to two jurors during recess]; *Hutson* v. *Superior Court* (1962) *supra,* 203 Cal.App.2d 687 [public defender's asserted inability to cross-examine codefendant whom he previously represented].)

Thus in *People* v. *Valenti* (1957) *supra,* 49 Cal.2d 199, the prosecution was dismissed in midtrial when the court concluded from the testimony of a police officer that the arrest and incident search were illegal. We held that the ruling was erroneous but the People had no right of appeal therefrom, and in any event that a reversal would be futile because the double jeopardy clause barred a retrial: "The purpose of the constitutional provision against double jeopardy is to prevent repeated harassment of a defendant upon a charge of the same offense. Certainly this purpose is subserved by refusing to permit repeated retrials of a defendant in order to remedy *errors of law* such as those here made by the trial court in the course of trial." (Italics added.) (*Id.* at p. 209.)

Again, in *Jackson* v. *Superior Court* (1937) *supra,* 10 Cal.2d 350, this court held that prohibition would lie to prevent further proceedings after a mistrial predicated on an erroneous ruling relating to peremptory challenges; we reasoned (at p. 357) that the defendant "cannot be again subjected to jeopardy unless the jury be discharged without rendering a verdict, by his consent, or upon some legal necessity resulting from physical causes beyond the control of the court. [Citations.] If [the defendant is] deprived of a verdict because an *error of law* would result in a mistrial, except as provided by statute therefor, the discharge is equivalent to an acquittal and is a bar to a subsequent trial." (Italic added.)

■  In the case at bar the trial court declared a mistrial *sua sponte* on the ground that certain testimony had been erroneously admitted which assertedly made it "impossible to have a fair trial either from the point of view of the People or the defendants. . . ." Even if it had been clearly improper to admit the testimony, the ruling would not have constituted legal necessity for a mistrial under the foregoing principles. The court could have completed the trial of the cause and, in the event of a conviction, subsequently granted a motion for a new trial.

In any event it may be doubted whether the admission of the testimony was erroneous. ▇ Cross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude. (*People* v. *Murphy* (1963) 59 Cal.2d 818, 830-831 [31 Cal.Rptr. 306, 382 P.2d 346]; *People* v. *Scholl* (1964) 225 Cal.App.2d 558, 562 [37 Cal.Rptr. 475]; *People* v. *Jackson* (1960) 183 Cal.App.2d 332, 340 [6 Cal.Rptr. 505].) The trial court's flat assertion that "You can't impeach a witness by showing that she was under care of a psychiatrist" must be viewed in the light of recent decisions holding, at least in the context of sex crimes, that such evidence is not only admissible but its exclusion may constitute reversible error. (*People* v. *Newton* (1966) 244 Cal.App.2d 82, 86-88 [52 Cal.Rptr. 727] [erroneous restriction of cross-examination of prosecuting witness]; *People* v. *Neely* (1964) 228 Cal.App.2d 16, 19-20 [39 Cal.Rptr. 251, 20 A.L.R.3d 679] [erroneous exclusion of expert medical testimony]; see generally *People* v. *Russel* (1968) 69 Cal.2d 187, 195-197 [70 Cal.Rptr. 210, 443 P.2d 794]; *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 171-176 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].)

▇ Even less doubt surrounds the admissibility of Miss Patterson's testimony concerning her shooting at Louis Lee: given her denial of familiarity with or possession of firearms, defense counsel's reference to the Lee incident was proper impeachment by means of contradiction. (Evid. Code, § 780, subd. (f).) ▇ The prosecutor's subsequent inquiry on redirect examination into her motive for thus shooting at Lee exceeded the scope of permissible rehabilitation of an impeached witness, but as we have seen, defense counsel chose not to object to the admission of that testimony.[1]

Finally, the People urge us to reconsider our decision in *Cardenas* v. *Superior Court* (1961) *supra*, 56 Cal.2d 273, in which we declined to follow *Gori* v. *United States* (1961) 367 U.S. 364 [6 L.Ed.2d 901, 81 S.Ct. 1523].

---

[1] A case on all fours with ours is *State* v. *Stankevicius* (1966) 3 Conn. Cir. 580 [222 A.2d 356]. There the court interrupted defense counsel's cross-examination of a prosecution witness, pronounced it to be "highly prejudicial," *sua sponte* declared a mistrial and discharged the jury. The defendant's plea of double jeopardy was rejected, and he was convicted on retrial. The Connecticut appellate court reversed and ordered him discharged, reasoning (at p. 359) that "From the record before us, it would appear that the court considered the line of questioning of the state's witness by the defendant on cross-examination as prejudicial. There was no objection by the state to this line of questioning and no motion by the state for a mistrial. The court acted sua sponte. Whether, if made, an objection to the questions might have been sustained is no concern, since no objection was made. We do not see any compelling reason or urgent necessity or furtherance of the ends of justice in the declaration of a mistrial. We consider the action of the trial court an abuse of its discretion." The court further held that the defendant's silence in the face of the ruling below could not be deemed a waiver, pointing out that "the weight of authority is to the effect that the failure of the defendant to object to or to protest the court's discharge of the jury is not a waiver of a plea of former jeopardy."

██ We stated (at pp. 275-276 of 56 Cal.2d) that in *Gori* "a bare majority of the United States Supreme Court held that the granting of a mistrial on the court's own motion without the defendant's consent, but for the defendant's benefit, does not as a matter of law place the defendant in jeopardy under the Fifth Amendment to the United States Constitution. This holding does not accord with the uniform construction placed by this court upon the jeopardy provision of the California Constitution contained in article I, section 13 [citing cases]." The People emphasize that since *Cardenas* was decided, the jeopardy provision of the Fifth Amendment has been held applicable to the states through the Fourteenth Amendment. (*Benton* v. *Maryland* (1969) 395 U.S. 784, 794 [23 L.Ed.2d 707, 715-716, 89 S.Ct. 2056]; see also *Waller* v. *Florida* (1970) 397 U.S. 387 [25 L.Ed.2d 435, 438, 90 S.Ct. 1184]; *Ashe* v. *Swenson* (1970) 397 U.S. 436 [25 L.Ed.2d 469, 90 S.Ct. 1189].)

Even under *Gori,* however, the mistrial declared in the case at bar would invoke the prohibition against double jeopardy. The high court carefully limited the rule of that decision to cases "where it clearly appears that a mistrial has been granted in the sole interest of the defendant" (367 U.S. at p. 369 [6 L.Ed.2d at p. 905]). Here, by contrast, the trial court stated that the assertedly inadmissible evidence was "prejudicial to the People," and granted the mistrial because a fair trial was impossible "from the point of view of the People" as well as of the defendants. *Gori* itself suggested, as an example of double jeopardy, cases "in which a judge exercises his authority to help the prosecution, at a trial in which its case is going badly, by affording it another, more favorable opportunity to convict the accused." (*Ibid.*) (Accord, *Downum* v. *United States* (1963) 372 U.S. 734, 736 [10 L.Ed.2d 100, 102-103, 83 S.Ct. 1033].)

In any event, we adhere to our decision in *Cardenas* not to adopt the *Gori* rule in applying the double jeopardy provision of the California Constitution. ██ *Benton* requires only that the states accord their citizens at least as much protection against double jeopardy as is provided under the Fifth Amendment of the United States Constitution;[2] it does not forbid a state from according a *greater* degree of such protection. (See, e.g., *People* v. *Henderson* (1963) 60 Cal.2d 482, 496-497 [35 Cal.Rptr. 77, 386 P.2d 677].) Both *Benton* (395 U.S. at pp. 795-796 [23 L.Ed.2d at pp. 716-717])

---

[2]Thus the court in *Benton* stressed that its recent decisions had rejected the principle of *Palko* v. *Connecticut* (1937) 302 U.S. 319 [82 L.Ed. 288, 58 S.Ct. 149], that "basic constitutional rights can be *denied* by the States as long as the totality of the circumstances does not disclose a denial of 'fundamental fairness,'" and held that "The validity of petitioner's larceny conviction must be judged, not by the *watered-down* standard enunciated in *Palko,* but under this Court's interpretations of the Fifth Amendment double jeopardy provision." (Italics added.) (395 U.S. at pp. 795-796 [23 L.Ed.2d at p. 717].)

and our opinion in *Gomez* v. *Superior Court* (1958) 50 Cal.2d 640, 644 [328 P.2d 976], quote with approval the statement that "The underlying idea [of the protection against double jeopardy], one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." (*Green* v. *United States* (1957) 355 U.S. 184, 187-188 [2 L.Ed.2d 199, 204, 78 S.Ct. 221, 61 A.L.R.2d 1119].) We believe the same embarrassment, expense, and anxiety would be visited upon an individual who is compelled to defend himself a second time because his original trial was aborted without his consent by a well-meaning but overly solicitous judge.[3]

A defendant may choose not to move for or consent to a mistrial for many reasons. He may be of the opinion that no error in fact occurred, or if it occurred, that it was not prejudicial. He may believe that any error in admitting improper evidence can be cured by a motion to strike or a request for admonition, or can be refuted by impeachment of the witness or contrary defense evidence. Indeed, even when a palpably prejudicial error has been committed a defendant may have valid personal reasons to prefer going ahead with the trial rather than beginning the entire process anew, such as a desire to minimize the embarrassment, expense, and anxiety mentioned above. These considerations are peculiarly within the knowledge of the defendant, not the judge, and the latter must avoid depriving the defendant of his constitutionally protected freedom of choice in the name of a paternalistic concern for his welfare.

Accordingly, except in the limited instances of "legal necessity," the policy underlying the prohibition against double jeopardy will best be

---

[3] A not dissimilar situation was presented in *State* v. *Locklear* (1954) 16 N.J. 232 [108 A.2d 436]. There, the murder trial of the defendant was terminated over his objection after 19 days of taking testimony, when the prosecution discovered new evidence implicating two other men whom the defendant had accused as the actual perpetrators of the crime. The court granted a mistrial to permit the filing of a second indictment joining the new suspects. The defendant sought pretrial relief, and the Supreme Court of New Jersey sustained his plea of double jeopardy and ordered him discharged. After reviewing the leading cases on this "ancient doctrine rooted in the common law" (at p. 437), the court concluded (at p. 442) that "we have grave doubts as to the right of the State to seek a mistrial on newly discovered evidence" even though such evidence "admittedly favored the prisoner and tended to exculpate rather than incriminate him." The court observed that "The defendant was entitled so to move if he desired, but he declined to accept the newly proffered assistance and demanded the trial continue." Thus despite the fact that the ruling below was arguably beneficial to the defendant, the court held it did not constitute "legal necessity" for granting a mistrial without his consent.

served by firmly adhering to the rule that after jeopardy has attached no mistrial can be declared save with the defendant's consent. ■ Inasmuch as no consent was given in the case at bar, petitioners may not be tried a second time on the charge of murdering Jimmy Carney.

We are not unmindful of the apparent irony in denying the trial court jurisdiction to proceed because of a ruling made, at least in part, ostensibly for the benefit of these petitioners. But we do not deal here with a mere technicality of the law: as the *Locklear* court explained (at p. 442 of 108 A.2d), also in the context of a murder prosecution, "Assuming a failure of justice in the instant case, it is outweighed by the general personal security afforded by the great principle of freedom from double jeopardy. Such misadventures are the price of individual protection against arbitrary power."

Let a peremptory writ of prohibition issue as prayed.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would deny the writ.