[Crim. No. 39956. Second Dist., Div. Five. Sept. 16, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
GENERAL McJIMSON, Defendant and Appellant.

**COUNSEL**

Norman W. de Carteret, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

YOUNGER, J.*—Appellant timely entered a plea of "once in jeopardy" at the commencement of his second trial for the murder of Cynara Pope, the first having been declared a mistrial after a jury was impaneled because the deputy district attorney assigned the case was ill. At the second trial, McJimson was found guilty of second degree murder and sentenced to state prison.[1]

Because we conclude the judgment must be reversed on "double jeopardy" grounds, no exposition of the facts of the crime is necessary, but this court is mindful that the victim was the mother of a small child and that its ruling precludes retrial of a man convicted by a jury of beating her to death.

While not wishing to be unduly harsh on the trial judge, who attempted to be both fair and solicitous to the needs of counsel, our ruling, to which we feel absolutely compelled, makes brutally clear the need for extreme care—by deputy district attorneys as well as judges—in matters such as the declaration of mistrials.

A jury was impanelled on Thursday, November 13, 1980, and instructed to return to begin the trial on the following Monday, the 17th. By that date, however, Mr. Weiss, the deputy district attorney assigned to try the case, had come down with a strep throat. While no "formal" finding was made on this issue, the record is clear that Mr. Weiss' condition was completely incapacitating and that both the court and defense counsel agreed that it was.

The trial was continued, generally from day-to-day, until November 24, whereupon the court ascertained that Mr. Weiss was still too sick to begin trial. The following colloquy then took place between defense counsel (Mr. Lenoir), the court and Mr. Vezzani, the deputy district attorney "standing in" for Mr. Weiss:

"THE COURT: Mr. Vezzani, I think the first thing that I ought to do is let Mr. Lenoir get his request on the record, which I believe is something like, 'Don't you have someone else that can try this case?'

---

*Assigned by the Chairperson of the Judicial Council.

[1]The trial judge reduced the conviction to one of manslaughter at the time of sentencing.

"MR. LENOIR: Yes. I put that on the record Friday, Your Honor.

"MR. VEZZANI: Notwithstanding Mr. Lenoir's request, I don't know what he is going to do about it. He might go upstairs and talk to Mr. Ron Carroll, who is the Director of Central Operations. He might try talking to the calendar deputy from the court Mr. Weiss' case came from. I don't know where the files are. They may be in Mr. Weiss' office.

"I would have a feeling that because of the charges here, whoever would take over the case would need time to prepare it anyway, and by that time the likelihood is Weiss would be back anyway.

"What do you want to do?

"MR. LENOIR: I discussed it with my client in very great detail. Both he and I, as the court knows, have been very considerate in this matter. We were considerate when Mr. Weiss was engaged in another trial. We gave him an opportunity, waived time before.

"I discussed it with my client last week. He was totally upset last week about it, but somehow he agreed to go on until today.

"MR. VEZZANI: What would you like me to do, Gerry?

"MR. LENOIR: Nothing in particular. I don't know. I don't know what to say.

"MR. VEZZANI: You have jeopardy attached, so what you are trying to say [is] you got us by the short and curlies and you want to have someone walk in the door and say, 'I don't know what the case is about, but get on the stand and tell your story.'

"MR. LENOIR: You know better than that. I have a client to represent. The client is insisting. I got him to go along this far."

The record contains a great deal of other conversation between counsel and the court, but, significantly, at no point can it be shown, even by some sort of implication or silence, that defense counsel or his client agreed to the granting of a mistrial. To the contrary, counsel advised the court that he and his client "lik[ed] this jury."

The Attorney General concedes, as surely he must, that article I, section 15, of the California Constitution prevents a person from being placed in jeopardy twice for the same offense. The question of what constitutes "being placed on trial" or being "in jeopardy" is one which pretty well requires an arbitrary answer. There is nothing more logically compelling about the swearing in of the jury than some other point in a trial such as the swearing of the first witness, the first question being asked of a witness or the trial judge's telling the People to "proceed." ■ But plainly swearing the jury *is* California's time when jeopardy is deemed to "attach" and, after that point, the jury's being discharged is the equivalent to an acquittal, barring retrial unless "*legal necessity*" for the discharge is present. (*Larios* v. *Superior Court* (1979) 24 Cal.3d 324 [155 Cal.Rptr. 374, 594 P.2d 491].)

The leading case on "legal necessity" in California is *Curry* v. *Superior Court* (1970) 2 Cal.3d 707 [87 Cal.Rptr. 361, 470 P.2d 345], in which the trial judge, because he felt bizarre testimony from a key witness had "prejudiced both sides," declared a mistrial. ■ The Supreme Court, in addition to confirming the timing of "jeopardy attaching," held unequivocally that, absent clear consent of a defendant or his counsel, a mistried case may not be retried except for the inability of the jury to agree (Pen. Code, § 1140[2]), death or serious illness of a juror (§ 1123) or some other extraordinary cause "beyond the control of the court" (§ 1141; *Cardenas* v. *Superior Court* (1961) 56 Cal.2d 273 [14 Cal.Rptr. 657, 363 P.2d 889, 100 A.L.R.2d 371]). Even a cause so extreme as known juror misconduct does not warrant declaring a mistrial (i.e., permit a retrial) without a defendant's consent. (*Larios, supra*, 24 Cal.3d 324.)

Because we recognize the enormity of reversal of a killer's conviction under circumstances which will not permit a retrial, we have undertaken a review of not only federal precedent in the area, but that of our sister states as well. Notwithstanding the clear holding of our Supreme Court that our *state* constitutional standard (at art. I, § 15) is different from and higher than that demanded by the United States Supreme Court (*Curry, supra*, 2 Cal.3d at p. 716, citing *Cardenas, supra*, 56 Cal.2d 273) we have made that review to determine whether cases *factually* more similar to the instant one than *Curry* might suggest a different result. (See 1 Witkin, Cal. Crimes (1978 pocket supp.) § 183.)

---

[2]All statutory references are to the Penal Code unless otherwise indicated.

At first blush, the federal standard, which has come to be the constitutionally mandated *minimum* for 14th Amendment analysis of state convictions (*Benton* v. *Maryland* (1969) 395 U.S. 784 [23 L.Ed.2d 707, 89 S.Ct. 2056]), appears significantly lower than our own, permitting retrial after the declaration of a mistrial in a variety of situations since the landmark 1824 opinion by Mr. Justice Story in *United States* v. *Perez*, 22 U.S. (9 Wheat.) 579 [6 L.Ed. 165].

But, whether the federal standard is *lower* or not, it can be said that the cases enunciating it deal with issues which are simply *different* from any in the instant case. *Illinois* v. *Somerville* (1973) 410 U.S. 458 [35 L.Ed.2d 425, 93 S.Ct. 1066], for example, permits a state to retry a defendant after the declaration of a mistrial (following the jury being sworn) in a situation where the charging indictment was fatally defective and, under relevant state law, not amendable. Were the trial to have been held, reversal of a conviction would have been essentially automatic. Attempting to define the "manifest necessity" and "ends of public justice" standards used by the United States Supreme Court since *Perez*, Justice Rehnquist held: "A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial. If an error would make reversal on appeal a certainty, it would not serve 'the ends of public justice' to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court." (410 U.S. at p. 464 [35 L.Ed.2d at p. 431].)[3]

■  We have found no case[4] suggesting that prosecutorial illness is a proper basis for declaration of a mistrial, regardless of the particular language employed to define the standard. The only case expressly dealing with the issue in recent years is *Commonwealth* v. *Brooks* (1973) 225 Pa.Super. 247 [310 A.2d 338], in which the court stated "Recent decisional law leads us to the inexorable conclusion that such a reason for subjecting the defendant to a second trial can hardly be considered tantamount to 'manifest necessity.'" (310 A.2d at p. 339.)

---

[3]In spite of the lengthy review of the federal standard in the majority opinion in *Somerville*, four justices felt compelled to dissent.

[4]*Rasmussen* v. *White* (E.D.Tex. 1980) 502 F.Supp. 237, in which a federal court, on *habeas corpus*, in language clearly identified as dicta, indicated it might permit the state to begin a new trial after a first was aborted due to trial court congestion, is simply in accord with no precedent in any jurisdiction found by us.

Respondent cites *People* v. *Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265], certiorari denied (1977) 430 U.S. 986 [52 L.Ed.2d 382, 97 S.Ct. 1686] for the proposition that "absence of counsel may qualify as legal necessity." But that case was one in which *defense* counsel (for a codefendant, Van Houten) *disappeared without a trace* near the end of a trial. Those are very substantial differences from the instant case. The most obvious distinction is that the defendant personally *favored* a mistrial after her lawyer's disappearance, as her substitute counsel simply could not realistically argue her cause. Secondly, counsel was absolutely missing (under the circumstances of that case, quite likely never to return).

Here, we deal with a strep throat, a serious illness, but not one with long-term incapacity a likely outcome. Moreover, the illness was the *prosecutor's*, and the double jeopardy clauses of the state and federal Constitutions are among those rights afforded to individuals vis-à-vis the state. They are not intended to be reciprocal.

*People* v. *McNally* (1980) 107 Cal.App.3d 387 [165 Cal.Rptr. 715], involving disqualification of defense counsel during the trial due to a previously unknown conflict of interest, seems to be the *least* extreme circumstance in which a mistrial has been held proper without the defendant's own consent, but note that this situation is, again, not manipulable by the prosecutor or court.

We do not remotely suggest prosecutorial impropriety here, but the extremely strict standards of our law in this area reflect that the potential for abuse was very much on the minds of the framers. (See *Larios, supra*, 24 Cal.3d 324.) A prosecutor has no ability whatever under our system to "have a second chance at a defendant" absent a "hung jury" or reversal on appeal.

It is important to stress what this case does *not* involve. It does not involve questions such as "good cause" to continue a case as against a defendant's "speedy trial" rights. (See § 1382.) ▓ Certainly attorney—including prosecutor—illness is generally considered good cause to continue even beyond statutory time limits, the issue rarely even receiving appellate scrutiny. "Good cause" for continuances in this area is highly discretionary in the trial courts. (*People* v. *Andrade* (1978) 86 Cal.App.3d 963 [150 Cal.Rptr. 662]; *People* v. *Superior Court* (*Lerma*) (1975) 48 Cal.App.3d 1003 [122 Cal.Rptr. 267].)

We are neither unconcerned with the plight of the trial court and counsel, nor unmindful of the burden of constant day-to-day continuances. Further, it is critical that courts pay attention to the impact on the personal lives of citizens called to service on juries and, whenever constitutionally possible, to make that attention a high-priority factor in scheduling their matters. (See *People* v. *McNally* (1980) 107 Cal.App. 3d 387, 393 [165 Cal.Rptr. 715].) Here, all concerned had already put up with a highly inconvenient situation for a week. We do not have a *good* solution to the problem, any more than the prosecutor's doctors had any good solution for a strep throat.

But given that a bad situation often compels a search for the least onerous alternative, there were several lawful things that might have been done:

(1) The court could have gone on continuing the case from day to day, assuming it was in a position to make a proper finding of good cause for such continuances; it appears that good cause was present.

(2) The district attorney could have assigned another deputy to try the case.

(3) Especially if the court went ahead and continued the case for a few more days, the defendant might well have rethought his position on the desirability of a mistrial and agreed to one if, for example, he and his counsel concluded that the jurors would be angered by the delay.

As to reassigning the case within the district attorney's office, we recognized that institution's quite proper wariness of the judicial branch's transgression of the separation of powers doctrine, more informally phrased as "trying to tell us how to run the d.a.'s office." The record, including but not limited to the portions quoted above, does not place the "stand-in" deputy district attorney, Mr. Vezzani, in a professionally becoming light. Little assistance was given a trial judge who manifestly was seeking it and the caustic remarks directed at a defense attorney who was, with considerable courtesy, protecting his client's procedural posture were, at best, unnecessary. Professional prosecutors also resent anyone—courts included—assuming that deputies, in even the largest offices are "fungible" (in the slang term for this issue). Whatever truth there may be, historically or currently, in the "handoff" method of case assignment, in which a deputy picks up a case on the way into the courtroom, it is not looked upon with favor. "Vertical representation,"

in which a particular deputy handles a case from the complaint, through the preliminary and pretrial motions and into the trial, is increasingly the preferred method, particularly in serious cases as we have here. Indeed, Mr. Weiss had handled the case in its entirety.

But, having said all of that, we return to the proposition that Mr. Weiss could not then handle the trial and his office should have, more meaningfully than the record indicates it did, considered a reassignment. To say that this would be desirable would be inaccurate, but to say that reassignment is never done—including situations far less pressing than this one—would be assuming a level of naivete not present here. When a prosecutor (i) dies, (ii) is appointed to the bench or (iii) is seriously ill or injured,[5] reassignment is accomplished. We do not in this case, deal with the situation of a very small county with, perhaps, a single prosecutor; the facts of life in Los Angeles County include the presence of many very capable prosecuting attorneys.

In the real world, a combination of the three not-very-satisfactory remedies set forth above would probably be the best answer to the problem. A finding by the court, based on some on the record evidence, of Mr. Weiss' inability to proceed, coupled with a two- or three-day continuance[6] for either his recovery or the reassignment of the case (the choice properly being left between Mr. Weiss and his superiors) would not only eliminate the problem of an unprepared deputy representing the People but might well have caused reconsideration of the defense position on agreeing to a mistrial.

The case is remanded to the trial court, with directions to sustain appellant's plea of once in jeopardy.

Feinerman, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied October 12, 1982, and respondent's petition for a hearing by the Supreme Court was denied November 15, 1982. Newman, J., and Kaus, J., did not participate therein. Richardson, J., was of the opinion that the petition should be granted.

---

[5]These situations are more "emergency" in nature than vacations, resignations or reassignments, where some "lead time" is generally available.

[6]Sometimes, of course, a trial judge will simply get lucky and find, on inquiry, that all jurors *could* return on a date certain a week or two later. This inquiry should have been made.