[No. D004215. Fourth Dist., Div. One. Oct. 20, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR VALENZUELA-GONZALES, Defendant and Appellant.

**COUNSEL**

John H. Reaves, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert M. Foster and Michael D. Wellington, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TODD, J.**—Victor Valenzuela-Gonzales (Gonzalez) appeals his conviction of two counts of robbery (Pen. Code,[1] § 211) and two counts of kidnapping by force (§ 207, subd. (a)) following a court trial based on the transcripts and documents of previous proceedings in the case. The trial court also found Gonzales used a deadly weapon in the commission of each offense within the meaning of section 12022, subdivision (b). The court trial followed a mistrial granted because of prosecutorial misconduct and a subsequent jury trial in which the trial court granted a new trial because of instructional error.

Gonzales contends the federal double jeopardy clause should have barred his retrial because the prosecutorial misconduct in his first trial was intended to provoke him into moving for a mistrial. Gonzales also asks us as a matter of first impression to interpret the state's double jeopardy clause as a bar to retrial where the prosecutor consciously engages in prejudicial misconduct and *either intends or is indifferent to* the resulting mistrial.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

FACTS

College students Matthew Carey and Kathleen Earley arrived in San Diego on Thanksgiving Day, November 24, 1983. After dining in Tijuana, they stopped in San Ysidro to exchange pesos for dollars. When the couple returned to their car, a man wearing a leather jacket, scraggly in appearance, with uneven wet hair to the shoulders, a mustache and a growth of beard put a knife to Kathleen's throat. He pushed her in the car and directed Matthew to drive back to the border parking lot where the couple had earlier left their car. Stopping there, the man robbed both victims, locked them in the trunk and drove around for at least an hour stopping on occasion to demand more money for a drug fix. At the second of the stops, the victims had an opportunity to closely observe him. Kathleen noted his blue eyes; Matthew remarked he would never forget his face. The man stopped at a 7-Eleven store, left the engine running and got out of the car. The victims unlatched the back seat, climbed into the passenger compartment, drove away and called the police.

Each with some hesitation identified Gonzales as the kidnapper-robber from photographs shown to them by the police. At trial, Matthew had "no doubt" Gonzales was the perpetrator although he was heavier, his hair was neatly combed and he was clean shaven. His identification at the preliminary hearing was unsure because of the changed appearance. Kathleen was positive in her identification and remembered his "blue eyes." Matthew did not observe any facial scarring of the man. Neither smelled any alcohol.

Gonzales took the stand. He acknowledged coming to San Diego for the Thanksgiving holiday, drinking beer in an Otay pool hall and visiting his sister's house from 11 p.m. November 24 until 4 a.m. the following day. His eyes were green, he had gained weight and the left side of his face was scarred. Clean shaven except for a mustache, he admitted his facial hair was as pictured in a photo taken December 17, 1983. Friends and relatives confirmed his whereabouts at the Otay pool hall and his sister's house.

While the circumstances of the crime are fairly straightforward, aspects of the procedural history of the case are considerably more muddled: Gonzales's first trial began March 7, 1984, before Judge J. Perry Langford. During cross-examination of Gonzales, the prosecutor, Deputy District Attorney Daniel Williams, asked for a sidebar conference to obtain an advance ruling regarding the propriety of questioning Gonzales about a prior drug arrest. The trial court indicated it would not allow the questioning and Williams said he would drop the matter.[2]

---

[2] The entire sidebar colloquy was as follows:

The following day, when Gonzales's sister was on the stand, Williams—without seeking an advance ruling at sidebar—asked her whether her brother has any problems with drugs. Gonzales's trial counsel objected and moved for a mistrial. The motion was granted, based "simply [on] the misconduct of the District Attorney."[3]

"MR. WILLIAMS: Your Honor, one of the things I neglected to bring up, and I wanted to do this on—out of the presence of the jury before I started my direct—first examination of Mr. Gonzales. He's had several arrests for being under the influence of a narcotic, and both of the victims in this case have testified that the apparent motive for the theft is that 'I need a fix' for whatever. And what I want to do is ask him about that. [¶] It's not—I'm not really offering it to try to muddy up his reputation in terms of his prior criminal record. I'm not interested. But there's a motive that's been expressed, and I would like to have the court permit me to ask him about his habit. And even if he doesn't—I mean, I can stay away from the arrest factor of that. I don't care about that so much.

"[DEFENSE COUNSEL]: I would strenuously object. There's no evidence of his—when he was arrested, of his being under any influence of any addiction. Everything is quite stale with respect to the 11550 arrest.

"THE COURT: How far back?

"MR. WILLIAMS: The 11550's were 1982 and '83, I believe.

"[DEFENSE COUNSEL]: But certainly not around this period of time. There's no evidence of that.

"THE COURT: Well, but we are talking about description of a robber. And the whole issue is the manner in which your client does or does not fit the description. Being a user of narcotics is an item of description. [¶] The question is whether its prejudicial effect outweighs its probative value. It clearly has probative value, doesn't it?

"MR. WILLIAMS: Well, that's my position.

"[DEFENSE COUNSEL]: It's clearly extremely prejudicial.

"THE COURT: And it's clearly extremely prejudicial. It's not easy. [¶] I wouldn't admit it on the question of motive.

"[DEFENSE COUNSEL]: I think that—

"MR. WILLIAMS: Well, motive, identification, whatever that—

"THE COURT: Well, that's the problem. [¶] But, on the other hand, you realize that if I guess wrong, you shot your conviction down if you get one.

"MR. WILLIAMS: I know. I know.

"THE COURT: Do you want it?

"MR. WILLIAMS: That's a judgment call I'm making right now. I guess I have already made it. [¶] I know what you are saying. You never know what's going to happen. [¶] Well, the point is I think he's probably going to say no, and then I'm going to have to bring in officers to testify: Well, I arrested him and he was like this.

"THE COURT: What makes you think he is going to say no? Why would he oblige you? He's being pretty up front, and he probably will say yes.

"MR. WILLIAMS: If he does, that's even better.

"THE COURT: Is it? It's more unfair. [¶] If I knew he was going to lie about it, I would give him a chance to do it. But I suspect he won't. And that makes it hard.

"MR. WILLIAMS: Well, let's just forget it."

[3] The trial court elaborated: "And the District Attorney was on full notice that I regard it as a close question. He made one decision yesterday, and then he tells us that his own reexamination of what he had wrought by yesterday, plus my comments on it, convinced him that he needed it more than he thought he did yesterday, and so he asked a question which was objectionable . . . . [¶] . . . [T]he question was not just 352'd, but it was an improper question. [¶] . . . [I] *don't see how* under the circumstances we can conduct courts if we can't expect counsel to give the opportunity to rule. [¶] Mr. Williams, you showed us yesterday that

A second jury trial began May 29, 1984, before a different judge. Gonzales was convicted on all counts. Prior to sentencing, new counsel was substituted and presented a motion for a new trial, raising several issues. The trial court granted a new trial on the basis of instructional error. On August 13, 1984, Gonzales entered a plea of once in jeopardy. The People appealed the new trial order and this court affirmed in *People* v. *Gonzales* (D002084), an unpublished opinion issued July 31, 1985. On November 13, 1985, Gonzales's motion to sustain the plea of once in jeopardy was heard and denied by Judge Langford.

A third jury trial was to start on December 3, 1985, before Judge Alpha Montgomery. However, Gonzales waived his right to a jury trial, and the matter was submitted to Judge Montgomery for verdict based on the transcripts of the preliminary examination and both previous trials and various documents. The trial court found Gonzales guilty of all counts except those specifically dismissed by the district attorney.

### DISCUSSION

### I

■ Gonzales contends that after Judge Langford granted his motion for mistrial during the first trial the double jeopardy clause of the Fifth Amendment[4] to the United States Constitution barred any retrial. We disagree.

---

you knew that it was a subject as to which you should do that. You knew that I regard it as close. The conduct is of a sufficiently serious nature . . . ."

The trial court later explained to the jury: "Now, we don't try the District Attorney's office in these cases, and we don't grant mistrials just for purposes of punishment. But if it had happened by accident, I might have been more likely to try to continue the trial in one way or another, but it didn't happen by accident. [¶] And, accordingly, I feel that the only way to maintain—well, I told you one of my functions is to act as a referee, and referees impose penalties because that way they get listened to. And that is one ingredient of the grant of motion. . . ."

[4]The pertinent clause in the Fifth Amendment to the U.S. Constitution reads: ". . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

As a historical sidelight, we note legal purists point out that situations involving retrial following mistrial were not considered part of common law double jeopardy. Rather, an independent common law tradition, dating from early Stuart times, protected a defendant from having his trial needlessly aborted by the Crown when a prosecutor or judge believed the state was losing the trial. (*Regina* v. *Charlesworth* (1861) 121 Eng.Rep. 786.) In such cases where the state deliberately aborted the trial to obtain more favorable conditions at a subsequent retrial, this independent doctrine protected the defendant from a retrial. English courts continue to this day to distinguish between the two. (Friedland, Double Jeopardy (Oxford 1969).) Early on, federal courts recognized the independent doctrine and separate procedural right, most notably in *United States* v. *Perez* (1824) 22 U.S. (9 Wheat.) 579 [6 L.Ed. 165]. Double jeopardy is not mentioned in *Perez*. However, in *Wade* v. *Hunter* (1949) 336 U.S. 684, 689 [93 L.Ed. 974, 978, 69 S.Ct. 834], Justice Black designated this independent com-

Although a defendant's motion for mistrial generally acts as a consent to retrial, removing any double jeopardy bar, an exception has been recognized in some cases of official misconduct. (See *United States* v. *Dinitz* (1976) 424 U.S. 600, 611 [47 L.Ed.2d 267, 276, 96 S.Ct. 1075]; *United States* v. *Jorn* (1971) 400 U.S. 470, 485 [27 L.Ed.2d 543, 556-557, 91 S.Ct. 547].) In *Oregon* v. *Kennedy* (1982) 456 U.S. 667 [72 L.Ed.2d 416, 102 S.Ct. 2083], the Supreme Court delineated the standard of misconduct required to invoke double jeopardy: "*Only* where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." (*Id.* at p. 676 [72 L.Ed.2d at p. 425].) (Italics added.)

Hence, the question of whether the federal double jeopardy bar should have been applied here revolves solely around whether prosecutor Williams intended to provoke Gonzales into moving for a mistrial. Fortuitously, we have a detailed finding by the very judge who heard and granted the mistrial motion that this was not Williams's intent. At the November 13, 1985, hearing, Judge Langford made the following findings: "I disagree in your assessment that Mr. Williams committed his act of misconduct for the purpose of provoking a mistrial so that he could take another run at the case. As a matter of fact, if I had agreed with you, it's quite conceivable that I would not have granted the mistrial, but rather would have admonished the jury in a manner which would have rendered Mr. Williams either curly-headed or bald. And I think I could have done that.

"But I believed then, and I believe now, that though Mr. Williams engaged in a—an intentional act of prosecutorial misconduct, his purpose was not to obtain a mistrial in order to start over."

"The situation was that I had suggested to him some considerable risks in the introduction of some evidence that he wanted introduced, and I also made some comments about the nature of the evidence in the case, that it was truly a triable case, which it was and is. There are two sides to it. It's an eyewitness identification case by strangers, which is a type of thing that is enough to scare anybody as to the possibility of a miscarriage of justice. But that's a far cry from Mr. Williams thinking he was about to lose and trying to salvage the case. I don't believe he thought that, and I didn't think that, either.

"Rather what he had was a close case that he might win and he might lose, and some evidence that he thought would do him a substantial amount

mon law procedural right as an aspect of double jeopardy. Subsequently, courts in this country have routinely dealt with it under the rubric of double jeopardy law, as we shall do here.

of good, which he wanted to get in, and there was a judge who was waffling and shilly-shallying and saying that it was a question whether it could come in or refusing to receive it on grounds stated. And that's an interesting little aspect of the case which you have to throw in in order to understand where it was.

"The evidence of the defendant's involvement with narcotics was not irrelevant. I don't know if Mr. Williams ever figured out the ground on which it might be admissible. He was offering it for the purpose of motive. He couldn't make the foundation, as I understand it, in either trial on that ground. And it may be that it couldn't have been admitted on any ground. But it was potentially relevant.

"The evidence in the trial was that whoever perpetrated the offenses charged here—and there isn't any dispute that someone perpetrated those offenses. It's an identification case. Whoever that person was was a narcotic addict in need of drugs. The evidence left that crystal clear. So that that aspect of the criminal became part of his description, and if the defendant fit the description in that way, that was relevant evidence—in other words, there may be many, many Hispanic people who physically look like the defendant and who might be mistaken for the defendant by the victims, or the defendant might be mistaken for them by the victims, and probably substantial fewer Hispanic narcotic drug addicts who look like the defendant; and therefore the fact that the—if it be a fact, that the defendant fitted that aspect of the description, would be relevant.

"And that was what was troubling me at the time. It was a 352 problem. You could let the evidence in for that purpose; but the problem of telling a jury, 'Now, you may consider the fact that the defendant's an addict for the purpose of deciding whether he's the person who committed this particular offense, but you may not consider the fact that he is an addict for the purpose of thinking that because he's an addict he's more likely to be guilty than not,' that's a terrible line to explain to a jury of lay people.

"The danger of prejudice was profound, and that's what bothered me, and that's what I was struggling with. And I firmly believe that what Mr. Williams proposed to do was to set my mind at rest and make it unnecessary for me to struggle. Having laid the information before the jury, I'm quite certain he expected that I would conclude that it was a close question, the evidence had come in, and that I would admonish the jury. And he cared not what I told the jury, because he figured that he had it for what it was worth, no matter what limiting instruction I gave, and that's why he

did it, not because he wanted a mistrial, but because he wanted the evidence and he didn't want me interfering with his getting it. And that's why I granted the mistrial, because I didn't see how a court could ever deal with a district attorney who proceeded along those lines.

"Simple question of authority. He couldn't get away with it, and so I granted the mistrial. And he didn't get away with it, and he didn't get it the second time around, either."

Judge Langford's findings on the issue are supported by substantial evidence, and, therefore, dispositive. (*Barajas* v. *Superior Court* (1983) 149 Cal.App.3d 30, 33, fn. 4 [196 Cal.Rptr. 599].) In light of Judge Langford's finding that Williams lacked the requisite intent, under *Oregon* v. *Kennedy, supra,* 456 U.S. 667, it is clear that the double jeopardy bar under federal law does not apply here.

## II

■ The federal double jeopardy provision and the standards developed in its application by the United States Supreme Court apply to the states through the due process clause of the Fourteenth Amendment. (*Benton* v. *Maryland* (1969) 395 U.S. 784, 795-796 [23 L.Ed.2d 707, 716-717, 89 S.Ct. 2056].) However, states are not precluded from extending greater protection if they can find an independent state ground for doing so. California has done so in the area of double jeopardy. (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 716 [87 Cal.Rptr. 361, 470 P.2d 345].)

■ The California Constitution provides in article I, section 15, "Persons may not twice be put in jeopardy for the same offense . . . ." Gonzales urges us as a matter of state constitutional law to interpret this provision more broadly than the United States Supreme Court has interpreted the federal double jeopardy clause in *Oregon* v. *Kennedy, supra,* 456 U.S. 667, with respect to defense-requested-mistrial/retrial situations.

Gonzales refers us to decisions by the supreme courts of Oregon and Arizona, each of which has adopted a more stringent standard than *Oregon* v. *Kennedy.* In *State* v. *Kennedy* (1983) 295 Ore. 260 [666 P.2d 1316], the Oregon Supreme Court held the double jeopardy clause of the Oregon Constitution bars a retrial "when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either

intends or is indifferent to the resulting mistrial or reversal." (*Id.* at p. 1326.) The Arizona Supreme Court, in *Pool* v. *Superior Court* (1984) 139 Ariz. 98 [677 P.2d 261], held that jeopardy attaches under the Arizona Constitution when a mistrial is granted on motion of defendant or declared by the court under the following conditions: "1. Mistrial is granted because of improper conduct or actions by the prosecutor; and [¶] 2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and [¶] 3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial." (*Id.* at pp. 271-272, fn. omitted.)

Both the Oregon and Arizona Supreme Courts found fault with the federal standard set forth in the opinion of *Oregon* v. *Kennedy, supra,* 456 U.S. 667. The two state courts disagreed with the premise of the opinion that a test broader than intent to provoke a mistrial would in reality be standardless. Instead, the Oregon and Arizona Supreme Courts went along with the reasoning of the four-member minority, which concluded the majority's[5] test must necessarily involve a subjective inquiry and is too difficult to determine. We are not likewise persuaded.

We, of course, are not blind to the practical difficulties of proving intent. But as noted by the majority opinion and Justice Powell's concurring opinion, intent can be inferred from the objective circumstances of the conduct at issue. (*Oregon* v. *Kennedy, supra,* 456 U.S. at pp. 675, 680 [72 L.Ed.2d 416, 427].) The Supreme Court majority called the intent test "a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system." (*Id.* at p. 675 [72 L.Ed.2d at p. 424].) We tend to agree, and, if anything, the facts and findings by Judge Langford here bear this out.

The broader tests adopted by the Oregon and Arizona Supreme Courts and suggested by the minority in *Oregon* v. *Kennedy, supra,* 456 U.S. 667, encompass a more generalized test that has variously been characterized as "bad faith conduct" or "harassment" or "overreaching." Besides being so

---

[5] Although *Oregon* v. *Kennedy, supra,* 456 U.S. 667 has been characterized as a plurality opinion (see *Pool* v. *Superior Court, supra,* 677 P.2d at pp. 268, 271), it is in fact a majority opinion by Rehnquist, J., joined in by Burger, C. J., and White, Powell and O'Connor, JJ. Powell, J., filed a concurring opinion as well. (See syllabus of opinion, 456 U.S. at p. 668.)

broad as to be essentially standardless, the tests display a basic naivete of courtroom dynamics and trial strategy in an adversarial system.

"Every act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt. Given the complexity of the rules of evidence, it will be a rare trial of any complexity in which some proffered evidence by the prosecutor or by the defendant's attorney will not be found objectionable by the trial court. Most such objections are undoubtedly curable by simply refusing to allow the proffered evidence to be admitted, or in the case of a particular line of inquiry taken by counsel with a witness, by an admonition to desist from a particular line of inquiry.

"More serious infractions on the part of the prosecutor may provoke a motion for mistrial on the part of the defendant, and may in the view of the trial court warrant the granting of such a motion." (456 U.S. at pp. 674-675 [72 L.Ed.2d at p. 424].)

If we were to adopt the amorphous tests urged by Gonzales, there would be little rhyme or reason to the jeopardy bar. A single "overreaching" question could trigger the bar in one case if the court were offended, yet more egregious conduct might not bar retrial in another. Vigorous advocacy might be condemned in one quarter while it could be allowed in another. We believe it would be a mistake to adopt such an approach that is necessarily premised on a case-by-case analysis.

The intentional provocation standard is clear, thereby avoiding the uneven application that is inherent in the standards urged upon us by Gonzales. Furthermore, the intent test does not condone prejudicial conduct. The court still retains the discretion to declare a mistrial and the power to hold the egregious prosecutor in contempt of court.

In determining whether California should adopt a standard more stringent than the federal standard, it is important to consider the interests implicated by the double jeopardy prohibition. Perhaps the most prominent is the defendant's right to an adjudication by a particular tribunal. Included in this notion is the defendant's right not to be burdened with the anxiety and expense of repeated trials and his right to a fair trial.[6] At the same time,

---

[6]Justice Black suggested in *Green* v. *United States* (1957) 355 U.S. 184 [2 L.Ed.2d 199, 78 S.Ct. 221, 61 A.L.R.2d 1119] that double jeopardy is designed to protect defendants from three kinds of abuse: "The underlying idea, one that is deeply ingrained in at least the Anglo-

we cannot lose sight of society's interest in the punishment of those properly found guilty. A double jeopardy claim cannot be properly disposed of by analyzing one of these factors to the exclusion of the other; a balancing of the interests at stake is essential.

When a defendant is deprived of his right to continue a trial before a particular tribunal because of misconduct designed to provoke a mistrial, the deprivation is so unjustified that society's interest in the punishment of those properly found guilty must yield to a discharge of the accused. However, when the intent of the deprivation is not so evident, it is the defendant's and society's interest in a fair trial that is primarily affected, and the remedy of a new trial is sufficient to vindicate both. The public interest in convicting those guilty of crimes is too important an interest to be subordinated to a concept of a prosecutor's recklessness. (See *Burks* v. *United States* (1978) 437 U.S. 1, 15 [57 L.Ed.2d 1, 12, 98 S.Ct. 2141].)

Gonzales argues that without the retrial bar, the defendant who is the victim of prosecutorial overreaching is left with a Hobson's choice between giving up his first jury and continuing the trial tainted by prejudicial judicial or prosecutorial error.

But Gonzales's analysis ignores the fact that the prosecutor gets less than he desires as well. In the event of prejudicial error he must continue with a case that he can no longer win. That is, once a prosecutor commits the kind of error that is grounds for a mistrial, the trial becomes tainted and the defendant becomes entitled to a reversal if he is eventually convicted.[7] Accordingly, if a defendant has an option to proceed with the trial while preserving his claim of error, it means that he has something to win and little to lose. If he is acquitted despite the taint, he succeeds in ending the case once and for all; if he is convicted, his conviction will be reversed and he will be given a second opportunity—this time error free—to obtain an acquittal. The defendant's option to go with the first jury represents a

American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby [1] subjecting him to embarrassment, expense and ordeal and [2] compelling him to live in a continuing state of anxiety and insecurity, as well as [3] enhancing the possibility that even though innocent he may be found guilty." (*Id.* at pp. 187-188 [2 L.Ed.2d at p. 204].)

Justice Harlan observed that once a trial begins, a defendant has a legitimate interest in getting the trial over with "once and for all." (*United States* v. *Jorn, supra,* 400 U.S. at p. 486 [27 L.Ed.2d at p. 557].)

[7]To say an error is grounds for a mistrial means it is the kind of error that cannot be cured by cautionary instructions; by the same token, to say an error cannot be cured by cautionary instructions means it is ordinarily grounds for reversal.

pragmatic compromise between the defendant's interest in finality and society's interest in prosecution. A defendant's constitutional interest in finality is not absolute and must be balanced against society's interest in conducting further proceedings. Society has a vital interest in fair trials designed to end in just judgments and in the enforcement of criminal laws.

We find persuasive the close analogy between an appellate reversal of an erroneous conviction upon a defendant's appeal and the trial court's declaration of a mistrial upon defense motion. In cases of appellate reversal of a conviction, obviously the error was egregious, even flagrant, and was done with the deliberate purpose of enhancing the chance of conviction. It is nonetheless clear the sanction was the reversal itself and retrial was not barred.

"The determination to allow reprosecution in these circumstances [after reversal of erroneous conviction] reflects the judgment that the defendant's double jeopardy interests, however defined, do not go so far as to compel society to so mobilize its decisionmaking resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error." *United States* v. *Jorn, supra,* 400 U.S. at p. 484 [27 L.Ed.2d at p. 556].)

It is absolutely clear that only those reversals based upon the legal insufficiency of the evidence—that is, those cases which should have resulted in verdicts of not guilty upon the merits—will be reversed outright and that reversals for other varieties of error will result in a remand. (*Burks* v. *United States, supra,* 437 U.S. 1.)

"[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished." (437 U.S. at p. 15 [57 L.Ed.2d at p. 12].) We see no basis in law or reason to avoid applying this rationale to Gonzales's case.

As indicated above, this is a case of first impression in California. However, *People* v. *Hathcock* (1973) 8 Cal.3d 599 [105 Cal.Rptr. 540, 504 P.2d

476] (disapproved on another ground in *People* v. *Green* (1980) 27 Cal.3d 1, 33-34 [164 Cal.Rptr. 1, 609 P.2d 468], which in turn was disapproved on another ground in *People* v. *Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [164 Cal.Rptr. 1, 609 P.2d 468]) acknowledged the issue without addressing it.[8] *Hathcock,* nonetheless, lends support to our rejection of Gonzales's argument regarding his Hobson's choice.

In *Hathcock,* our Supreme Court affirmed the first degree murder conviction of defendant on a retrial after a mistrial. The defendant had moved for the mistrial after the prosecutor asked a number of questions about the defendant's alleged involvement in the business of prostitution. On appeal, the defendant contended his double jeopardy right had been violated when he was forced to undergo a second trial after his initial trial ended in a mistrial. The *Hathcock* court noted the general rule that a defense motion for mistrial ordinarily will remove any barrier to reprosecution. The court continued: "Defendant attempts to dilute the strength of this general principle in the instant case by contending that he cannot 'realistically' be found to have consented to his retrial since his motion for a mistrial was allegedly 'compelled' by the blatantly improper misconduct of the prosecutor. Defendant argues that the prosecutor's misconduct impaled him on the horns of an 'impossible dilemma': if defendant did not ask for a mistrial he ran an increased risk of conviction because of the inflammatory and prejudicial material improperly presented to the jury, while if he did ask for a mistrial and it was granted the prosecution would get 'a second crack' at the defendant, having gained the benefit of a full-scale rehearsal of the trial and exposure of the defendant's case.

"We fail to see how defendant's 'dilemma' differs in any significant respect from the normal situation arising after possibly prejudicial error has occurred at any trial. In determining whether or not to move for a mistrial, defendants must always weigh the disadvantages of allowing the prosecution to begin its case anew against the benefits of completely eliminating a given trial error; these opposing considerations were certainly as much present in all the cases establishing and applying the general rule of 'consent' as they are in the instant case. [Citation.] Nothing in the instant record suggests that the motion for mistrial was other than knowingly and

---

[8] The *Hathcock* court specifically said: "We have no occasion on the instant record to determine whether the general rule, barring a defendant's resort to the double jeopardy protections after a mistrial has been granted on his motion, is applicable in a case in which the prosecutor has deliberately caused the mistrial for the purpose of obtaining a fresh start. Although submitting this allegation, defendant points to no evidence in the record supporting such a characterization of the prosecutorial behavior and we have found no indication of such improper motivation in our review of the proceedings." (*People* v. *Hathcock, supra,* 8 Cal.3d at p. 614, fn. 14.)

intelligently made or that the defendant and his counsel were not fully aware of the consequences of the motion. Accordingly, there was no violation of the defendant's right not to be placed twice in jeopardy." (8 Cal.3d at p. 614, fn. omitted.) Here, too there was no violation of the defendant's right not to be placed twice in jeopardy. We have a detailed finding of fact by the trial court that the prosecutor did not intend to provoke a mistrial; hence, under federal law the double jeopardy bar does not apply. As to state law, we fail to see an adequate and independent state ground to adopt a standard different than the federal one.

### DISPOSITION

Judgment affirmed.

Kremer, P. J., and Work, J., concurred.