[No. B159149. Second Dist., Div. Five. Aug. 27, 2003.]

THE PEOPLE, Plaintiff and Appellant, v.
GARY FRIEDMAN et al., Defendants and Respondents.

## Counsel

Steve Cooley, District Attorney, Patrick D. Moran and Juliet Schmidt, Deputy District Attorneys, for Plaintiff and Appellant.

Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendant and Respondent Gary Friedman.

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Respondent Kenneth Friedman.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Respondent Carlos Rodriguez.

Janice Y. Fukai, Alternate Public Defender, Felicia Kahn Grant and Michael Miller, Deputy Alternate Public Defenders, for Defendant and Respondent Juan Galindo.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Pursuant to Penal Code[1] section 1238, subdivision (a)(8), the prosecution appeals from the trial court's April 12, 2002, order dismissing all counts in the amended information against defendants, Gary Friedman, Kenneth Friedman,[2] Carlos Rodriguez, and Juan Galindo. The amended information charged each defendant with two counts of murder (§ 187, subd. (a)) and two counts of kidnapping for ransom. (§ 209, subd. (a).) The amended information also alleged the following special circumstances were present: the killings were intentional and carried out for financial gain (§ 190.2, subd. (a)(1)); multiple murders were committed (§ 190.2, subd. (a)(3)); and the murders' were committed during a kidnapping. (§ 190.2, subd. (a)(17)(B).) The prosecution argues the trial court improperly dismissed the amended information pursuant to section 656. We agree.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are taken from the opinion in *U.S. v. Friedman* (2d Cir. 2002) 300 F.3d 111, 116–119: "Gary Friedman was an attorney who practiced in New York. The evidence at trial showed that, in 1991, Friedman began committing crimes, including robbery, extortion, kidnapping, and drug dealing. Friedman's primary associate in committing these crimes was his brother, Kenneth. Howard Bloomgarden was a nightclub owner and a friend of Gary Friedman. [¶] From 1992–1993, Bloomgarden sold marijuana in Miami. His supplier was Jorge Aguilar, a dealer based in California. Aguilar would obtain the marijuana in California and ship it to Bloomgarden in Florida by Federal Express. As shipments became larger and more frequent, Bloomgarden enlisted the help of his friend, Peter Kovach, who traveled to California and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] For purposes of clarity and not out of any disrespect, except when referring to the Second Circuit opinion, Gary and Kenneth Friedman will be referred to by their first names.

began arranging for shipments to travel by courier. Bloomgarden also expanded his marijuana trafficking to New York, where his longtime friend, Gary Friedman, led the operation. [¶] In April 1993, a shipment of approximately 800 pounds of marijuana sent from California by Kovach was intercepted and seized by the authorities in Illinois en route to Florida. Kovach used the seizure as an opportunity to break free from Bloomgarden: he arranged a meeting with Aguilar and Jeff Tobin, a major marijuana customer, at which they decided to cut Bloomgarden and the Friedmans out of the operation. Bloomgarden was forcefully notified of his exclusion from the marijuana operation on June 8, 1993, during an aborted attempt—presumably, by agents of Aguilar—to kidnap him. Bloomgarden never forgave Kovach for the April 1993 seizure and its fallout. [¶] In August 1994, Bloomgarden and Gary Friedman decided to reestablish Bloomgarden's marijuana business by kidnaping Kovach to obtain money and to reestablish a drug connection. Gary and Kenneth Friedman offered Gary's driver, Ruben Hernandez—who would eventually cooperate with the Government and serve as its star witness at trial—$10,000 and a cut of any future business if he would accompany Kenneth to California, where they would confront Kovach, try to obtain money from him, and reestablish contact with Aguilar. Hernandez testified that Kenneth told him that Gary would make the necessary travel arrangements and also would arrange to have a car and guns waiting for them when they arrived in California. [¶] Later that month, Gary asked one of his clients—Bruce Wolosky, who worked in a car dealership—to run a credit check on Kovach in an attempt to locate Kovach. Wolosky told Gary that Kovach was listed as working at a business called Galleria Telecom in Torrance, California. [¶] On September 6, 1994, another of Gary Friedman's clients, defendant-appellant Carlos Rodriguez, received a forty-three-minute telephone call from his childhood friend, Gus Malave, who was then living in San Diego, California. Two additional phone calls from Malave's house to Rodriguez's house of less than two minutes each were placed on September 13 and 14, 1994. Between September 7 and 24, 1994, Malave made multiple calls to a beeper number used by Edwin Torres, also known as 'Q,' an associate both of Rodriguez and of Kenneth Friedman. The Government stipulated at trial that there were no calls between Malave's house and Rodriguez's house after September 14, 1994. [¶] On September 23, 1994, 'Tracey Stewart' wired $3,000 from Queens, New York, to Gus Malave in San Diego. The parties stipulated at trial that Stewart was on Rodriguez's approved visitor list for the detention facility where he was being held at the time of trial, but no evidence was introduced as to their relationship during 1994. Hernandez testified at trial that, before the California trip, he heard from either Kenneth or Gary that Bloomgarden and Gary were to arrange for Rodriguez to wire money to Gus Malave. [¶] The same day [¶] September 23, 1994—Gary, Kenneth, and Hernandez traveled to Torrance, California. Two days later, Malave arrived in Torrance with a car, and Malave provided guns

to them later that week. As soon as Malave arrived with the car, the four men (Gary, Kenneth, Hernandez, and Malave) drove to the Galleria Telecom store. Malave entered the store, identified Kovach (from an old photograph), and took some store brochures as he left. [¶] Over the next several days, the four men took turns stalking Kovach at the store, looking for an opportunity to kidnap Kovach while he was alone at night, near closing time. During this time period, Gary purchased duct tape, rubber gloves, and tinting sprays to use in the crime. Gary also arranged for further financing from Bloomgarden. [¶] Gary left California near the end of September to attend to a court appearance in New York. From New York, Gary continued to provide direction and financing to the remaining men. To take Gary's place, Kenneth and Hernandez recruited Juan Galindo. [¶] On October 10, 1994, Kenneth, Hernandez, and Galindo were arrested after their car was pulled over by the police and none of them was able to produce a driver's license or other identification. [Fn. omitted] After their arrest, they were taken to the Torrance County Jail, where they provided false names. [¶] ... [¶] Kenneth used the pay telephone in his cell to call Gary eight times; during some calls, Gary included Bloomgarden or a California attorney in a conference call. During the calls, Kenneth told Gary (in cryptic language) of the circumstances of the arrest and of their intention to kidnap Kovach. In discussing the possibility of bail, Gary told Kenneth that he would obtain a Los Angeles address for the jailed men to use: [¶] K. FRIEDMAN: So, if I could get out on bail here, I could finish that. [¶] G. FRIEDMAN: I understand. I'll have, I'll have an address for you there. [¶] K. FRIEDMAN: Yeah. [¶] G. FRIEDMAN: In L.A., that you can use. [¶] K. FRIEDMAN: Um-hum. [¶] G. FRIEDMAN: Okay? [¶] K. FRIEDMAN: Yeah. What from Carl? [¶] G. FRIEDMAN: Nope, from Betty. [Citation.] [¶] Gary further instructed Kenneth to call 'Betty' at her home in the morning. [Citation.] Gary eventually arranged for the California attorney to post bond so that Kenneth, Hernandez, and Galindo could be released before the California authorities realized that Kenneth was on work release from a previous sentence and that there was an outstanding warrant for Galindo's arrest. The men were released from jail on bail later that same day (October 10, 1994). [¶] The next day—October 11, 1994—Kenneth called Malave, who returned to Torrance to provide a new car and replacement guns. At trial, Hernandez testified that 'Gary and Carlos [Rodriguez]' sent the money to Malave to buy the replacement car and guns. Hernandez admitted on cross-examination, however, that he had consistently told investigators in proffer sessions prior to trial that Kenneth arranged for the replacement items directly with Malave, and that the money for these items had been sent to Malave by Bloomgarden, not Rodriguez. [¶] To avoid being arrested again (for lack of a driver's license) if their car was stopped, Kenneth, Hernandez, and Galindo asked Malave to become their driver, and he agreed. The four men then resumed stalking Kovach. [¶] On October 26, 1994, Kenneth, Hernandez, and Galindo burst into the Galleria Telecom store

and kidnapped Kovach and Ted Gould, a bystander who happened to be in the store at the time. With Malave acting as driver, the men took Kovach and Gould to a nearby motel. There, they tied up the victims and called Gary to update him. Gary told them that Bloomgarden would call. While they waited, they beat Kovach while asking for money, and thwarted an attempt by Kovach to escape. [¶] Shortly thereafter, Bloomgarden called, spoke to Kovach, and demanded money. Kovach pleaded that he had none. Bloomgarden then spoke with Kenneth and approved the murder of Kovach and Gould. Kenneth, with the assistance of Hernandez and Galindo, then choked Kovach and Gould to death. Those three men placed the bodies of Kovach and Gould in the trunk of the car driven by Malave. [¶] The next day, Kenneth called Gary, told him of the murders, and arranged for additional funds to return to New York. When Kenneth, Galindo, and Hernandez arrived in New York, Gary met them at the airport, angrily asking them how they could have been 'so stupid,' as they had been so recently arrested near Kovach's business with kidnaping paraphernalia and a brochure from the store. [¶] After Kenneth told Gary that they had left the bodies with Malave, who was to dump them in Mexico, Gary had additional money wired to Malave. Rather than dispose of the bodies in Mexico, however, Malave did so by abandoning the car with the bodies in the trunk at an industrial strip in San Diego."

The defendants in this case were originally charged in the United States District Court for the Eastern District of New York. Amongst the numerous charges against them in an indictment, was count 16, which alleged a violation of title 18 United States Code section 1952(a)(3)(B), commonly known as the "Travel Act" or "Travel in Aid of Racketeering" which alleged: "On or about and between September 15, 1994 and October 31, 1994, ... within the Eastern District of New York, the Central District of California, and elsewhere, the defendants GARY FRIEDMAN ..., KENNETH FRIEDMAN ..., CARLOS RODRIGUEZ ..., together with others, did knowingly and intentionally travel in interstate commerce with intent to commit a crime of violence to further unlawful activity, to wit, extortion, and thereafter performed a crime of violence, which resulted in the deaths of Peter Douglas Kovach and Theodore Jamieson Gould." Mr. Galindo pled guilty to count 16 on June 28, 1996, and received a 210-month sentence. There were no murder or kidnapping charges in the federal prosecution. Gary, Kenneth, and Mr. Rodriguez were convicted on various charges, including count 16, the Travel Act violation. Gary received an aggregate term of life plus 300 months. Kenneth received a term of life plus 540 months. Mr. Rodriguez originally received a 468-month sentence. Mr. Rodriguez's count 16 conviction was reversed by the Second Circuit Court of Appeals. (*U.S. v. Friedman, supra,* 300 F.3d at pp. 115–116, 129.) Hence, Mr. Rodriguez's total sentence was reduced to 87 months, which consisted of concurrent terms. (*Ibid.*)

On December 26, 2001, defendants were charged in California in an information with kidnapping for ransom and murder as outlined above. On February 11, 2002, the trial court commenced a hearing on the issue of whether section 656 barred prosecution in this case. The amended information was filed on April 8, 2002. Although the motion was initially filed by Gary, all defendants joined. On April 12, 2002, the trial court granted defendants' dismissal motion pursuant to section 656.

## III. DISCUSSION

The California Supreme Court has held, "[P]rosecution and conviction for the same act by both state and federal governments are not barred by the constitutional protection against double jeopardy." (*People v. Belcher* (1974) 11 Cal.3d 91, 96–97 [113 Cal.Rptr. 1, 520 P.2d 385], fn. omitted; see *Abbate v. United States* (1959) 359 U.S. 187, 194–195 [3 L.Ed.2d 729, 79 S.Ct. 666]; *Bartkus v. Illinois* (1959) 359 U.S. 121, 136 [3 L.Ed.2d 684, 79 S.Ct. 676].) However, the *Belcher* court further held: "[The] rule ... does not preclude a state from providing greater double jeopardy protection than the United States Supreme Court has determined to be available under the Fifth Amendment of the United States Constitution. [Citation.]" (*People v. Belcher, supra,* 11 Cal.4th at p. 97; *Curry v. Superior Court* (1970) 2 Cal.3d 707, 716 [87 Cal.Rptr. 361, 470 P.2d 345].) ■ California has barred serial convictions for the same acts in section 656, "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of another State, Government, or country, founded upon the act or omission in respect to which he is on trial, he has been acquitted or convicted, it is a sufficient defense." Enacted as part of the codification of the Penal Code in 1872, the code commissioners comment to section 656 states, "This section is intended to apply in cases where the foreign acquittal or conviction took place in respect to the particular *act or omission* charged against the accused upon the trial in this State, and is not restricted to cases where the accused was tried abroad under the same or facts constituting the same *charge*." (Code commrs. note foll. Ann. Pen. Code, § 656 (1st ed. 1872, Haymond & Burch, commrs. annotators) p. 141.) With respect to serial prosecutions for the same acts, section 793 provides, "When an act charged as a public offense is within the jurisdiction of another State or country, as well as of this State, a conviction or acquittal thereof in the former is a bar to the prosecution or indictment therefor in this State." (See *People v. Comingore* (1977) 20 Cal.3d 142, 148 [141 Cal.Rptr. 542, 570 P.2d 723]; *People v. Brown* (1988) 204 Cal.App.3d 1444, 1449 [251 Cal.Rptr. 889].) There were no annotations by the code commissioners to section 793. (Ann. Pen. Code, § 793 (1st ed. 1872, Haymond & Burch, commrs. annotators).)

A brief history of the cases that interpret these statutes is in order. In *People v. Candelaria* (1956) 139 Cal.App.2d 432, 440 [294 P.2d 120], our

colleagues in Division Three of this appellate district reversed the defendant's conviction for robbery in state court. The defendant had previously been convicted of robbery of a national bank in federal court for the same incident. The *Candelaria* court held, "All the acts constituting the state offense were included in the federal offense and were necessary to constitute the federal offense." (*Id.* at p. 440.) In addition, the *Candelaria* court concluded: "The only additional element involved in the federal prosecution was that the money belonged to a national bank whose deposits were federally insured. That additional element, regarding the status of title to or insurance on the money, pertained to the matter of jurisdiction of the federal court, and it did not pertain to any activity on the part of defendant in committing the robbery." (*Ibid.*) Hence, the Court of Appeal held reprosecution of defendant for robbery in superior court was barred by section 656.

The following year, our colleagues in Division One of this appellate district revisited the *Candelaria* case in *People v. Candelaria* (1957) 153 Cal.App.2d 879, 884 [315 P.2d 386]. Following the dismissal of the defendant's robbery conviction, he was charged and convicted in state court of burglary with respect to the same bank robbery. The defendant argued that his burglary conviction violated section 656. The second *Candelaria* decision held that section 656 was of no assistance with respect to the burglary: "The 'act' spoken of in the statute must be 'the same act.' The burglary act complained of in the present case, that is, the entering of the building with the intent to commit a theft, is not the same act complained of in the federal court, namely, that he pointed a gun at the teller and by force and fear compelled her to deliver over to him certain monies." (*People v. Candelaria, supra,* 153 Cal.App.2d at p. 884.)

In *People v. Belcher, supra,* 11 Cal.3d at page 99, the California Supreme Court characterized the two *Candelaria* opinions as follows: "These two cases—both involving the same defendant and transaction but charging separate offenses—clearly demonstrate the meaning to be given to the terms 'act or omission' as they are used in section 656. Under this section, a defendant may not be convicted after a prior acquittal or conviction in another jurisdiction if all the acts constituting the offense in this state were necessary to prove the offense in the prior prosecution (*People v. Candelaria, supra,* 139 Cal.App.2d [at p.] 440); however, a conviction in this state is not barred where the offense committed is not the same act but involves an element not present in the prior prosecution. (*People v. Candelaria, supra,* 153 Cal.App.2d [at p.] 884.)" In *People v. Belcher, supra,* 11 Cal.3d at page 99, the California Supreme Court interpreted the second *Candelaria* decision to have held, "[A] conviction in this state is not barred where the offense committed is not the same act but involves an element not present in the prior prosecution." The defendant in *Belcher* was convicted of two counts of robbery and assault with a deadly weapon in state court against a federal

narcotics agent and an undercover police officer. He had previously been convicted of assault with a deadly weapon on a federal narcotics agent in federal court for the same incident. In holding the state conviction for assault with a deadly weapon on the federal narcotics agent should be reversed pursuant to section 656, the *Belcher* court held, "[C]onviction of the federal offense required proof of no additional *act* on the part of defendant; it merely required proof of the status of the victim for jurisdictional purposes." (*Belcher, supra,* 11 Cal.3d at p. 100, original italics.)

The California Supreme Court revisited the section 656 issue in *People v. Comingore, supra,* 20 Cal.3d at pages 145–149. The defendant in *Comingore* took the victim's car in California without her permission. The defendant drove the car to Oregon. While still in Oregon, the defendant was arrested. In an Oregon state court, the defendant was charged with unauthorized use of an automobile and pled guilty there. Defendant was subsequently arrested in California and charged with grand theft automobile and driving or taking of a car. The California prosecution involved the same victim, car, and theft. (*Id.* at pp. 144, 146–148.) The California Supreme Court affirmed the trial court's dismissal of the state court charges. The court concluded the defendant's Oregon conviction was based on the same acts as the pending California charges. In *Comingore,* the Supreme Court emphasized the following language from the first *Candelaria* opinion: "The *physical act or conduct* of defendant in taking the money was the same whether the robbery be considered as a federal ... or a state offense." (*Id.* at p. 147, citing *People v. Candelaria, supra,* 139 Cal.App.2d at p. 440, original italics in *Comingore.*) Relying on the findings of *Belcher* the *Comingore* court held: " '[A] defendant may not be convicted after a prior acquittal or conviction in another jurisdiction if all the acts constituting the offense in this state were necessary to prove the offense in the prior prosecution [citation]; however, *a conviction in this state is not barred where the offense committed is not the same act but involves an element not present in the prior prosecution.* [Citation.]' " (*People v. Comingore, supra,* 20 Cal.3d at p. 146, original italics, quoting *People v. Belcher, supra,* 11 Cal.3d at p. 99.) In reaching its conclusions, *Comingore* relied also on section 793. However, the court clarified: " '[T]here appears to be no legal significance in the different wording of [section] 656 and [section] 793.' [Citation.] Sections 656 and 793 ... use similar terms and *the parties have not suggested, nor are we able to discover, any reason to believe that one of the statutes was intended to provide greater protection than the other ....*" (*People v. Comingore, supra,* 20 Cal.3d at p. 148, fn. omitted.)

In 1988, our colleagues in the Court of Appeal for Third Appellate District cited *Comingore* in affirming the trial court's finding that the prosecution of defendants in state court for burglary was not barred by their prior federal convictions for the conspiracy to commit the burglary. The conspiracy was

formed in Nevada. (*People v. Brown, supra,* 204 Cal.App.3d at pp. 1448–1451.) In so finding, the *Brown* court noted, "It is settled that the 'act' referred to in section 656 means the physical act or conduct of the defendant for which he is prosecuted." (*People v. Brown, supra,* 204 Cal.App.3d at p. 1448, citing *People v. Comingore, supra,* 20 Cal.3d at p. 147.) In *Brown,* our colleague, Associate Justice Richard M. Sims III, synthesized the first *Candelaria* opinion, *Belcher,* and *Comingore* as follows: "This discussion in *Belcher,* echoing that in the first *Candelaria* case, plainly assumes that had the prior federal prosecution required proof of an act not required in the state prosecution, section 656 would have been inapplicable. Otherwise, the court would have dismissed the Attorney General's argument as irrelevant. Moreover, in *Comingore, supra,* 20 Cal.3d at page 147, the court reiterated *Belcher*'s analysis of the Attorney General's argument. We therefore infer from these discussions that under section 656 a prior prosecution has been 'founded upon the act or omission in respect to which [a defendant] is on trial' only where the acts necessary to prove the serial offenses are the same. [¶] We also think this construction of the statute produces a just result. Unlike section 793, which bars serial prosecutions, section 656 bars only serial convictions. (*Comingore, supra,* 20 Cal.3d at p. 148.) The apparent fairness rationale of section 656 lies in its prohibition upon multiple convictions for the same wrongful conduct. This rationale has no validity where successive convictions are premised on different wrongful acts. If the prior federal conviction was premised upon a separate act not necessary to obtain the California conviction, then defendants were not serially convicted for the same wrongful conduct." (*People v. Brown, supra,* 204 Cal.App.3d at p. 1450, fns. omitted.) The *Brown* court applied the foregoing analysis to the federal conspiracy conviction and state burglary charge as follows: "This is the case here. Under federal law, the 'gist' of the conspiracy offense is an unlawful agreement among the conspirators. (*Braverman v. United States* (1942) 317 U.S. 49, 53 [87 L.Ed. 23, 63 S.Ct. 99] [].) Thus, 'it is the unlawful agreement and not the overt act which is punished in a conspiracy; …' (*Toliver v. United States* (9th Cir. 1955) 224 F.2d 742, 744.) Here, the crucial act for which defendants were prosecuted and convicted in federal court was their agreement in Nevada to commit the California burglary. However, nothing in the record suggests the Nevada agreement was an act necessary to obtain the conviction of any defendant for burglary of the California store." (*People v. Brown, supra,* 204 Cal.App.3d at p. 1450.) As a result, the *Brown* court upheld the defendants' California burglary convictions. (*Id.* at p. 1451.)

In *People v. Lazarevich* (2001) 95 Cal.App.4th 416, 424–426 [115 Cal.Rptr.2d 419], the Court of Appeal for the Sixth Appellate District partially reversed a trial court's order granting the defendant's section 656 dismissal motion. The defendant took his two children from his wife's

custody in Santa Cruz, California to Serbia, then Yugoslavia, in 1989. In 1991, the defendant was prosecuted in Serbia for taking and detaining the children from the lawful custody of their mother. Defendant was convicted and sentenced to pay a fine or spend seven days in custody. The children were not returned to their mother's custody until 1995. In 1999, following the defendant's extradition, deportation, and return to California, he was arraigned on charges pursuant to section 278.5 stemming from his retaining and concealing a minor between October 1, 1989, and June 8, 1995. Our Sixth Appellate District colleagues held that the defendant's acts between 1989 and his conviction in Serbia in 1991 were barred by sections 656 and 793. But the conviction for unlawful conduct in 1989 through 1991 did not preclude his prosecution for his willful unlawful detention of his children between 1991 and 1995, when they were finally returned to their mother. (*People v. Lazarevich, supra,* 95 Cal.App.4th at pp. 424–426.)

Last year, our colleagues in Division Four of this appellate district again examined the provisions of section 656. In *People v. Gofman* (2002) 97 Cal.App.4th 965, 969–971 [119 Cal.Rptr.2d 122], the defendants were indicted in state court with 37 counts, including conspiracy to commit insurance fraud and grand theft, insurance fraud, making a false or fraudulent claim, and grand theft. These charges arose in connection with staged automobile accidents and the related submission of false insurance claims. A federal court indictment based on the same events charged the defendants with conspiracy to commit mail fraud and mail fraud. The defendants pled guilty to some of the federal charges. Our Division Four colleagues found the trial court erred in dismissing the conspiracy counts against two defendants. The two defendants were convicted of substantive counts but not the conspiracy charge in the federal action. Our Division Four colleagues examined the relationship between conspiracy and substantive counts as follows: " 'Under federal law, the "gist" of the conspiracy offense is an unlawful agreement among the conspirators. [Citation.] Thus, "it is the unlawful agreement and not the overt act which is punished in a conspiracy; ..." [Citation.] Here, the crucial act for which defendants were prosecuted and convicted in federal court was their agreement in Nevada to commit the California burglary. However, nothing in the record suggests the Nevada agreement was an act necessary to obtain the conviction of any defendant for burglary of the California store.' (*People v. Brown*[, *supra*,] 204 Cal.App.3d [at p.] 1450 [].) [¶] The same result may obtain in the reverse situation, where the substantive crime is committed in another jurisdiction but a defendant is charged with conspiracy in California. 'Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy. [Citations.] "... It does not require the commission of the substantive offense that is the object of the conspiracy. [Citation.] 'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to

commit a crime,' and 'thus reaches further back into preparatory conduct than attempt ....' " [Citation.]' *(People v. Morante* (1999) 20 Cal.4th 403, 416–417 [84 Cal.Rptr.2d 665, 975 P.2d 1071].)" *(People v. Gofman, supra,* 97 Cal.App.4th at p. 973.)

■ We review a pure question of law under an independent review standard. *(People v. Jones* (2001) 25 Cal.4th 98, 103 [104 Cal.Rptr.2d 753, 18 P.3d 674]; *People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].) All four defendants argue that their prosecution in California for kidnapping for ransom and murder is barred because those crimes involve the "same acts" as the federal offense. We disagree.

All of the cited cases compare the language of the federal and state statutes. *(People v. Comingore, supra,* 20 Cal.3d at p. 147; *People v. Belcher, supra,* 11 Cal.3d at p. 99; *People v. Candelaria, supra,* 153 Cal.App.2d at p. 884; *People v. Candelaria, supra,* 139 Cal.App.2d at p. 440.) Title 18 United States Code section 1952 provides in pertinent part: "(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—[¶] ... [¶] (2) commit any crime of violence to further any unlawful activity; or [¶] ... [¶] and thereafter performs or attempts to perform—[¶] ... [¶] (B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life. [¶] (b) As used in this section (i) 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States ...." The Travel Act was enacted as part of the Attorney General's 1961 legislative program directed against "organized crime." (See *Taylor v. United* States (1990) 495 U.S. 575, 595 [109 L.Ed.2d 607, 110 S.Ct. 2143]; *Perrin v. United* States (1979) 444 U.S. 37, 41 [62 L.Ed.2d 199, 100 S.Ct. 311].) The Tenth Circuit has described the Travel Act as follows: "The Travel Act 'impose[s] criminal sanctions upon the person whose work takes him across State or National boundaries in aid of certain "unlawful activities." ' H.R.Rep. No. 966, at 4 (1961), *reprinted in* 1961 U.S.C.C.A.N. 2664, 2666 (letter from Attorney General Robert F. Kennedy to the Speaker of the House of Representatives). The Travel Act is, 'in short, an effort to deny individuals who act [with the requisite] criminal purpose access to the channels of commerce.' *Erlenbaugh v. United States* [(1972)] 409 U.S. 239, 246 [34 L.Ed.2d 446, 93 S.Ct. 477]." *(U.S. v. Welch* (10th Cir. 2003) 327 F.3d 1081, 1090.) In *McCormick v. United States* (1991) 500 U.S. 257, 280 [114 L.Ed.2d 307, 111 S.Ct. 1807], the United States Supreme Court described the Travel Act as criminalizing "the use of interstate commerce for

purposes of bribery." The United States Supreme Court described the purpose of the Travel Act as follows: "The Travel Act, primarily designed to stem the 'clandestine flow of profits' and to be of 'material assistance to the States in combating pernicious undertakings which cross State lines,' thus reflects a congressional judgment that certain activities of organized crime which were violative of state law had become a national problem." (*United States v. Nardello* (1969) 393 U.S. 286, 292 [21 L.Ed.2d 487, 89 S.Ct. 534], fn. omitted; *United States v. Hughes* (2d Cir. 1969) 411 F.2d 461, 464.)

In contrast with the Travel Act focus on interstate travel, section 209, subdivision (a) defines kidnapping for ransom, "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony ...." Section 187, subdivision (a) defines murder as, "Murder is the unlawful killing of a human being ... with malice aforethought." Section 189 defines felony murder, "All murder which is ... committed in the perpetration of, or attempt to perpetrate ... kidnapping ... is murder of the first degree."

The foregoing legal distinctions frame the different dimensions of the offenses in this case, which are critical to the operation of sections 656 and 793. ▉ We agree with the prosecution that the Travel Act does not *require* proof of any of the physical acts required to prove the crimes of kidnapping or murder committed while engaged in kidnapping. As noted earlier, in *People v. Belcher, supra,* 11 Cal.3d at page 99, the California Supreme Court held: "[A] conviction in this state is not barred where the offense committed is not the same act but involves an element not present in the prior prosecution." (See also *People v. Comingore, supra,* 20 Cal.3d at p. 146; *People v. Candelaria, supra,* 153 Cal.App.2d at p. 884.) In *People v. Brown, supra,* 204 Cal.App.3d at page 1450, Associate Justice Sims wrote, "If the prior federal conviction was premised upon a separate act not necessary to obtain the California conviction, then defendants were not serially convicted for the same wrongful conduct." We examine the issue before us by applying the immediately foregoing language in *Belcher* and *Brown.*

Utilizing the *Belcher* analysis, the presence of an element in the current litigation which was not the present in the prior prosecution, the current lawsuit requires defendants complete the offenses of murder or kidnapping for purposes of ransom. (*People v. Belcher, supra,* 11 Cal.3d at p. 99.) There was no requirement in the federal prosecution that the defendants commit a murder. ▉ The Travel Act is violated by interstate travel with the

requisite intent to commit an unlawful act. (*U.S. v. Welch, supra,* 327 F.3d at p. 1092 ["The Travel Act proscribes not the unlawful activity per se, but the use of interstate facilities with the requisite intent to promote such unlawful activity."]; *U.S. v. Luskin* (4th Cir. 1991) 926 F.2d 372, 379.) The House Appropriations Committee report on what would ultimately become title 18 United States Code section 1952 stated, "The gist of the offense is the travel in interstate commerce or the use of the facilities of interstate commerce or of the mails with the requisite intent and the offense is complete whether or not the murder is carried out or even attempted." (1984 U.S. Code Cong. & Admin. News, at p. 3485.) Further, in this case, the jury in the federal prosecution was not even instructed on the elements of murder. (*U.S. v. Friedman, supra,* 300 F.3d at pp. 127–128.) Also, in *Friedman,* the Second Circuit held that the Travel Act did not require proof that the defendants personally participated in the commission of a murder. (*Id.* at p. 128.) In *Friedman,* the Second Circuit concluded that the testimony "conclusively established that the deaths … resulted from the extortion … (a 'crime of violence' …)" and there was no requirement that the defendants personally have participated in a murder. (*Id.* at p. 128.) Therefore, because the present prosecution requires proof of a murder and kidnapping for ransom which was unnecessary in the *Friedman* federal case, utilizing the *Belcher* analysis, the charges could not be dismissed pursuant to sections 656 and 793.

Further, utilizing the *Brown* analysis, because the federal conviction was premised upon a separate act which was unnecessary to secure guilty verdicts in the state case, the dismissal motion should have been denied. (*People v. Brown, supra,* 204 Cal.App.3d at p. 1450.) We agree with the prosecution's obvious contention that the Travel Act charges required interstate travel. The murder and kidnapping for purposes of ransom charges in the present case do not require interstate travel. Accordingly, under the *Brown* analysis, the charges should not been dismissed pursuant to sections 656 and 793.

The "acts" spoken of in the state statutes for kidnapping and murder are not "the same acts" complained of in the federal court. The acts in the federal case required proof that defendants traveled in interstate commerce to commit a crime of violence. The federal prosecution did not require proof defendants committed kidnapping or murder. ■ The defendants' federal Travel Act convictions did not bar their prosecution from pursuing the factually and legally broader charges of kidnap for ransom and murder. (*People v. Gofman, supra,* 97 Cal.App.4th at pp. 971–976; *People v. Lazarevich, supra,* 95 Cal.App.4th at pp. 424–426; *People v. Brown, supra,* 204 Cal.App.3d at pp. 1448–1451; *People v. Candelaria, supra,* 153 Cal.App.2d at p. 884.)

## IV.   DISPOSITION

The judgment dismissing the amended information is reversed.

Armstrong, J., and Mosk, J., concurred.

Respondents' petition for review by the Supreme Court was denied November 19, 2003. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.